**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Ramada Worldwide Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RAMADA WORLDWIDE INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>INN AT THE WICKLIFFE, LLC, an Ohio limited liability company; MEETA SHETH, an individual; and GHANSHYAM PATEL, an individual.<br><br>Defendants. | Civil Action No. 15-<br><br>**VERIFIED COMPLAINT** |

Plaintiff Ramada Worldwide Inc., by its attorneys, LeClairRyan, complaining of defendants Inn at The Wickliffe, LLC, Meeta Sheth and Ghanshyam Patel, says:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Ramada Worldwide Inc., ("RWI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2. Defendant Inn at The Wickliffe, LLC ("Wickliffe"), on information and belief, is a limited liability company organized and existing under the laws of the State of Ohio, with its principal place of business at 28600 Ridgehills Drive, Wickliffe, Ohio, 44092.

3.     Defendant Meeta Sheth ("M. Sheth"), on information and belief, is a principal of Wickliffe and a citizen of the State of Tennessee, residing at 1611 Ashley Mill Drive, Chattanooga, TN 37421.

4.     Defendant Ghanshyam Patel ("G. Patel"), on information and belief, is a principal of Wickliffe and a citizen of the State of New York, residing at 50 N. Woodside Lane, Williamsville, New York 14221.

5.     Upon information and belief, M. Sheth and G. Patel are the only constituent members of Wickliffe.

6.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over Wickliffe by virtue of, among other things, section 17.6.3 of the June 27, 2008 franchise agreement by and between Wickliffe and RWI (the "Franchise Agreement"), described in more detail below, pursuant to which Wickliffe has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

9.     This Court has personal jurisdiction over M. Sheth and G. Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which M. Sheth and G. Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

10.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Wickliffe of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Ramada® Marks

11.     RWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

12.     RWI owns and has the exclusive right to license the use of the service mark RAMADA and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Ramada® Marks"), as well as the distinctive Ramada® System, which provides guest lodging services to the public under the Ramada® name and certain services to its Franchisees, including a centralized reservation system, advertising, publicity, and training services.

13.     RWI or its predecessors first used the RAMADA mark in 1970 and the Ramada® Marks are in full force and effect.  Certain of the registered Ramada® Marks are incontestable pursuant to 15 U.S.C. § 1065.

14.     RWI has given notice to the public of the registration of the Ramada® Marks as provided in 15 U.S.C. § 1111.

15.     RWI uses or has used the words "Ramada," among others, as abbreviations of its brand name.

16.     Through its franchise system, RWI markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, RWI allows its franchisees to utilize the Ramada® Marks and to promote the Ramada® brand name.

17.     RWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Ramada® Marks as distinctly designating RWI guest lodging services as originating with RWI.

18.     The value of the goodwill developed in the Ramada® Marks does not admit of precise monetary calculation, but because RWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of RWI's goodwill exceeds hundreds of millions of dollars.

19.     The Ramada® Marks are indisputably among the most famous in the United States.

**The Agreements Between The Parties**

20.     On or about June 27, 2008, RWI entered into the Franchise Agreement with Wickliffe for the operation of a 213-room Ramada® guest lodging facility located at 28600 Ridgehills Drive, Wickliffe, OH 44092, designated as Site No. 26455-77316-01 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

21.     Pursuant to section 5 of the Franchise Agreement, Wickliffe was obligated to operate a Ramada® guest lodging facility for a fifteen-year term, during which time Wickliffe was permitted to use the Ramada® Marks in association with the operation and use of the Facility as part of RWI's franchise system.

22.     Pursuant to section 3 of the Franchise Agreement, Wickliffe was required, among other things, to make renovations to the Facility, in order to bring the Facility into compliance with "System Standards," "Approved Plans," and/or a "Punch List," all of which were defined in or attached to the Franchise Agreement, and to achieve and maintain certain scores on periodic quality assurance inspections conducted by RWI.

23.     Pursuant to section 3.2 of the Franchise Agreement, Wickliffe was required to operate the Facility in compliance with RWI's "System Standards," as defined in the Franchise Agreement, including RWI's quality assurance requirements.

24.     Pursuant to section 4.8 of the Franchise Agreement, RWI had the right to conduct unlimited quality assurance inspections to determine whether the Facility was in compliance with RWI's quality assurance requirements.

25.     Pursuant to section 7, 18.2 and Schedule C of the Franchise Agreement, Wickliffe was required to make certain periodic payments to RWI for royalties, service assessments, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

26.     Pursuant to section 7.3 of the Franchise Agreement, Wickliffe agreed that interest is payable "on any past due amount payable to [RWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

27.     Pursuant to section 3.6 of the Franchise Agreement, Wickliffe was required to prepare and submit monthly reports to RWI disclosing, among other things, the amount of gross room revenue earned by Wickliffe at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to RWI.

28.    Pursuant to section 3.6 of the Franchise Agreement, Wickliffe agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Wickliffe agreed to allow RWI to examine, audit, and make copies of the entries in these books, records, and accounts.

29.    Pursuant to section 12.1 of the Franchise Agreement, Wickliffe agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to RWI in accordance with a formula specified in the Franchise Agreement.

30.    Section 18.4 of the License Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room of the Facility that Wickliffe was authorized to operate at the time of termination.

31.    Section 13 of the Franchise Agreement specified Wickliffe's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Ramada® Marks.

32.    Pursuant to section 17.4 of the Franchise Agreement, Wickliffe agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

33.    Effective as of the date of the Franchise Agreement, M. Sheth and G. Patel provided RWI with a Guaranty of Wickliffe's obligations under the Franchise Agreement. A true copy of the Guaranty is attached hereto as Exhibit B.

34. Pursuant to the terms of the Guaranty, M. Sheth and G. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause [Wickliffe] to perform, each unpaid or unperformed obligation of Franchisee under the [Wickliffe] Agreement."

35. Pursuant to the terms of the Guaranty, M. Sheth and G. Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by RWI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

**The Defendants' Defaults and Termination**

36. From the inception of the Franchise Agreement, Wickliffe repeatedly failed to operate the Facility in accordance with RWI's System Standards, in breach of its obligations under the Franchise Agreement.

37. On March 11, 2009, RWI conducted a quality assurance ("QA") inspection of the Facility. By letter dated April 10, 2009, a true copy of which is attached hereto as Exhibit C, RWI advised Wickliffe that (a) the Facility received a failing score in the QA inspection and, as a result, Wickliffe was in default of its obligations under the Franchise Agreement, (b) pursuant to the Franchise Agreement, it had 90 days within which to cure the QA default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

38. On July 23, 2009, RWI conducted another QA inspection of the Facility. By letter dated August 5, 2009, a true copy of which is attached hereto as Exhibit D, RWI advised Wickliffe that (a) the Facility received a second consecutive failing score in the QA inspection and, as a result, Wickliffe remained in default of its obligations under the Franchise Agreement, (b) it was invited to submit to RWI for approval a proposed written improvement

plan as to how the default could be cured and (c) if the improvement plan was not submitted and approved, then reservation service to the Facility might be suspended and the Franchise Agreement might be subject to termination

39. On November 4, 2009, RWI conducted another QA inspection of the Facility. By letter dated December 2, 2009, a true copy of which is attached hereto as Exhibit E, RWI advised Wickliffe that (a) the Facility received a third consecutive failing score in the QA inspection and, as a result, Wickliffe remained in default of its obligations under the Franchise Agreement, and (b) that the Facility's central reservation system was suspended due to the default and the Franchise Agreement remained subject to termination.

40. On April 7, 2010, RWI conducted another QA inspection of the Facility. By letter dated April 28, 2010, a true copy of which is attached hereto as Exhibit F, RWI advised Wickliffe that (a) the Facility received a fourth consecutive failing score in the QA inspection and, as a result, Wickliffe remained in default of its obligations under the Franchise Agreement, and (b) that the Facility's central reservation system remained suspended due to the default and the Franchise Agreement remained subject to termination.

41. On June 3, 2010, RWI conducted another QA inspection of the Facility. By letter dated July 7, 2010, a true copy of which is attached hereto as Exhibit G , RWI advised Wickliffe that (a) the Facility received a fifth consecutive failing score in the QA inspection and, as a result, Wickliffe remained in default of its obligations under the Franchise Agreement, (b) it was invited to submit to RWI for approval a proposed written improvement plan as to how the default could be cured and (c) if the improvement plan was not submitted and approved, then reservation service to the Facility might be suspended and the Franchise Agreement might be subject to termination.

42. On December 21, 2010, RWI conducted another QA inspection of the Facility. By letter dated March 25, 2011, a true copy of which is attached hereto as Exhibit H, RWI advised Wickliffe that (a) the Facility received a sixth consecutive failing score in the QA inspection and, as a result, Wickliffe remained in default of its obligations under the Franchise Agreement, and (b) the Franchise Agreement remained subject to termination.

43. On Feb ruary 12, 2013, RWI conducted another QA inspection of the Facility. By letter dated February 14, 2013, a true copy of which is attached hereto as Exhibit I, RWI advised Wickliffe that (a) the Facility received a failing score in the QA inspection and, as a result, Wickliffe remained in default of its obligations under the Franchise Agreement, and (b) the Franchise Agreement remained subject to termination.

44. By letter dated July 10, 2013 , a true copy of which is attached as Exhibit J, RWI terminated the Franchise Agreement, effective July 10, 2013, and advised Wickliffe that (a) it was to immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as a Ramada® Facility, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Ramada® System facility, (b) all items bearing the Ramada® Marks had to be removed, (c) all signs and any listings in directories and similar guides in which the Facility was identified as a Ramada® had to be changed, (d) it was required to pay to RWI as liquidated damages for premature termination the sum of $213,000.00 as required under the Franchise Agreement, (e) it had to de-identify the Facility within 10 days from the receipt of the notice, and (f) demand was made for all outstanding Recurring Fees through the date of termination.

45. The termination of the Franchise Agreement precludes Wickliffe from any further use of the Ramada® Marks in or around the Facility.

46. The termination of the Franchise Agreement precludes Wickliffe from any further use of the Ramada® Marks to induce the traveling public to use the Facility in any way.

47. Since the termination of the Franchise Agreement, Wickliffe has continued to use the Ramada® Marks to induce the traveling public to rent guest rooms at the Facility.

48. Since the termination of the Franchise Agreement, Wickliffe has used the Ramada® Marks without authorization to rent rooms through, among other things, failure to remove Ramada® signage and continuing to identify the Facility as a Ramada® guest lodging facility in response to telephone inquiries as to whether or not the Facility is a Ramada®.

49. By letter dated May 18, 2015, a true copy of which is attached as Exhibit K, Wickliffe received notification from RWI to cease and desist from the misuse of the Ramada® Marks. Despite this notification, Wickliffe has continued to misuse the Ramada® Marks.

**FIRST COUNT**

50. RWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 49 of the Verified Complaint.

51. Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

52. Wickliffe marketed, promoted, and rented, and continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Ramada® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

53. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

54. The acts of Wickliffe in marketing, promoting, and renting rooms at the Facility, through and with the Ramada® Marks, constitute:

(a) a false designation of origin;

(b) a false and misleading description of fact; and

(c) a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of Wickliffe's Facility with RWI, and to cause confusion, or to cause mistake, or deception, to the effect that RWI sponsors or approves of the guest lodging services that Wickliffe provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

55. Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark

has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

56.   Wickliffe's use of the Ramada® Marks in connection with goods and services at the Facility, after the Ramada® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Ramada® Marks, and lessened and will continue to lessen the capacity of the Ramada® Marks to identify and distinguish the goods and services of RWI, all in violation of Section 43(c) of the Lanham Act.

57.   Wickliffe's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

58.   Wickliffe's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on RWI.

59.   RWI has no adequate remedy at law.

60.   No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), RWI demands judgment against Wickliffe:

(a)   Preliminarily and permanently restraining and enjoining Wickliffe, its affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Ramada® Marks; and

(b) Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

**SECOND COUNT**

61. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 60 of the Verified Complaint.

62. Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Wickliffe agreed to allow RWI to examine, audit, and make copies of Wickliffe's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

63. Wickliffe has engaged in acts and practices, as described, which amount to infringement of the Ramada® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

64. As a result, Wickliffe owes restitution and the disgorgement of profits, in an amount unknown to RWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Wickliffe.

**WHEREFORE**, RWI demands judgment ordering that Wickliffe account to RWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Ramada® Marks.

**THIRD COUNT**

65. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 64 of the Verified Complaint.

66. By letter dated July 10, 2013, RWI terminated the Franchise Agreement, effective July 10, 2013, due to Wickliffe's failure to cure its quality assurance defaults pursuant to the terms of the Franchise Agreement.

67. Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Wickliffe shall pay liquidated damages to RWI within 30 days of termination.

68. Section 18.4 of the Franchise Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room of the Facility Wickliffe was authorized to operate at the time of termination.

69. As a result of the termination of the Franchise Agreement, Wickliffe is obligated to pay RWI liquidated damages in the amount of $213,000.00, as calculated pursuant to sections 12.1 and 18.4 of the Franchise Agreement.

70. Notwithstanding RWI's demand for payment, Wickliffe has failed to pay RWI the liquidated damages as required in sections 12.1 and 18.4 of the Franchise Agreement.

71. RWI has been damaged by Wickliffe's failure to pay liquidated damages.

**WHEREFORE**, RWI demands judgment against Wickliffe for liquidated damages in the amount of $213,000.00, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

72. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 71 of the Verified Complaint.

73. By virtue of the premature termination of the Franchise Agreement, RWI sustained a loss of future revenue over the remainder of the fifteen year term of the Franchise Agreement.

74. If the Court determines that Wickliffe is not liable to pay RWI liquidated damages as required by sections 12.1 and 18.4 of the Franchise Agreement then, in the alternative, Wickliffe is liable to RWI for actual damages for the premature termination of the Franchise Agreement.

75. RWI has been damaged by Wickliffe's breach of its obligation to operate a Ramada® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, RWI demands judgment against Wickliffe for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

**FIFTH COUNT**

76. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 75 of the Verified Complaint.

77. Pursuant to sections 7, 18.2 and Schedule C of the Franchise Agreement, Wickliffe was obligated to remit Recurring Fees to RWI.

78. Despite its obligation to do so, Wickliffe failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $29,958.25.

79. Wickliffe's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged RWI.

**WHEREFORE**, RWI demands judgment against Wickliffe for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $29,958.25, together with interest, attorneys' fees, and costs of suit.

**SIXTH COUNT**

80. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 79 of the Verified Complaint.

81. At the time of the termination of the Franchise Agreement, Wickliffe was obligated to pay RWI Recurring Fees.

82. Despite its obligation to do so, Wickliffe failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $29,958.25.

83. In addition, Wickliffe benefited from its wrongful use of the Ramada® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to RWI in return for that benefit.

84. Wickliffe's failure to compensate RWI constitutes unjust enrichment and has damaged RWI.

**WHEREFORE**, RWI demands judgment against Wickliffe for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $29,958.25, together with interest, attorneys' fees, and costs of suit and all royalties and other Recurring Fees that should be paid to compensate RWI for the period during which Wickliffe misused the Ramada® Marks and was thereby unjustly enriched, together with interest and costs of suit.

**SEVENTH COUNT**

85. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 84 of the Verified Complaint.

86.     Pursuant to the terms of the Guaranty, M. Sheth and G. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Wickliffe under the Franchise Agreement.

87.     Despite their obligation to do so, M. Sheth and G. Patel have failed to make any payments or perform or cause Wickliffe to perform each obligation required under the Franchise Agreement.

88.     Pursuant to the Guaranty, M. Sheth and G. Patel are liable to RWI for Wickliffe's liquidated damages in the amount of $213,000.00, or actual damages in an amount to be determined at trial, and Wickliffe's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $29,958.25, and for those additional Recurring Fees attributable to the period during which Wickliffe has misused the Ramada® Marks.

**WHEREFORE**, RWI demands judgment against M. Sheth and G. Patel for damages in the amount of:

(a) All liquidated damages or actual damages and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit; and

(b) all profits, royalties, and other Recurring Fees that should be paid to compensate RWI for the period during which Wickliffe misused the Ramada® Marks and was thereby unjustly enriched, together with interest, attorneys' fees and costs of suit.

**EIGHTH COUNT**

89. RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 88 of the Verified Complaint pursuant to the terms of the Franchise Agreement.

90. By letter dated July 10, 2013, RWI terminated the Franchise Agreement, effective July 10, 2013, due to Wickliffe's failure to satisfy the Quality Standards pursuant to the terms of the Franchise Agreement.

91. Section 13.2 of the Franchise Agreement provides that, when the Franchise Agreement is terminated, RWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Wickliffe did] not remove[] or obliterate[] within five days after termination."

92. Wickliffe continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Ramada® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

93. Wickliffe's unauthorized use of the Ramada® Marks has inflicted and continues to inflict irreparable harm on RWI.

**WHEREFORE**, RWI demands judgment declaring that RWI, or its authorized agent, has the right, without prior notice to Defendants, to enter the property at the Facility and remove any and all exterior signage, exterior items and other exterior materials displaying the Ramada® Marks.

**LeClairRyan**
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: ______________________
**BRYAN P. COUCH**

Dated: 6/1/15

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Ramada Worldwide Inc.

By: ______________________________
**BRYAN P. COUCH**

Dated: 6/1/15

**VERIFICATION**

STATE OF NEW JERSEY )
) ss:
COUNTY OF MORRIS )

Suzanne Fenimore, of full age, being duly sworn according to law, upon her oath, deposes and says:

I am Senior Director of Contracts Compliance for Ramada Worldwide Inc., which is plaintiff in this action.

I have read the foregoing Verified Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of RWI or information available through employees of RWI.

SUZANNE FENIMORE

Sworn and subscribed to before
me this 29th day of May, 2014

NOTARY PUBLIC

**CINDY J. O'CONNOR**
**Notary Public**
**State of New Jersey**
**My Commission Expires Feb. 13, 2020**

# <u>EXHIBIT A</u>

Location: WICKLIFFE, OH
Entity No. 77316-01
Unit No.: 26455

**RAMADA WORLDWIDE INC.**
**FRANCHISE AGREEMENT**

THIS FRANCHISE AGREEMENT ("Agreement"), dated 6/27, 2008, is between RAMADA WORLDWIDE INC., a Delaware corporation ("we", "our" or "us"), and INN AT THE WICKLIFFE, LLC, an Ohio limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. Franchise.** We have the exclusive right to franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a **"Ramada Plaza."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Ramada Inns National Association.**

2.1 **Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain franchisees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

2.2 **RINA Conference.** You or your representative will attend each RINA Conference when it is held. You will pay not less than one "Conference Registration Fee" for each Facility you own. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3. Your Improvement and Operating Obligations.**

3.1 **Pre-Opening Improvements.** You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as the System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

3.3 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4 **Marketing.**

3.4.1 You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.4.2 You will participate in any regional management association ("RMA") of Chain franchisees formed to provide regional marketing, training, and other benefits for Chain Facilities in your area. You will pay the RMA Fee described in Schedule C to support the RMA's activities, if and when levied.

3.4.3 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs including any arrangements we make with third party distribution channels that are mandated in the System Standards Manual. You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.4.4 You will participate in any guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C.

3.5 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6 **Financial Books & Records; Audits.**

3.6.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2 Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at

the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.6.4 You shall, at your expense, prepare and submit to us by the tenth day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require.

3.7 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.8 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Ramada Worldwide Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.9 **Conferences.** You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2. Mandatory recurrent training for franchisees and general managers described in Section 4.1.4 may be held at a RINA conference. The Fee will be the same for all Chain Facilities that we franchise in the United States. You will receive reasonable notice of a Chain conference.

3.10 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.11 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.You shall use your best efforts to promote usage of other Chain Facilities by members of the public. Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither your nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business.

3.12 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.13 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.14 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 125 points and the most recent quality assurance inspection score for the Facility was no more than 150 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

3.15 **Technology Standards & Communications.** You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment. You must purchase the computer system and other equipment and software that we specify. We may modify System Standards to require new technology at all Chain Facilities. At our request, you shall participate in any intranet or extranet system developed for use in connection with the System. Such intranet or extranet system may be combined with that of our affiliates. You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system. You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

**4. <u>Our Operating and Service Obligations</u>.** We will provide you with the following services and assistance:

4.1 **Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

4.1.1 **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may also offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for general manager

orientation which is payable before the scheduled date of the program. The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section. For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

4.1.2  **Owner Orientation Training.**  We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 60 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

4.1.3  **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F +GX score on Medallia electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our guest services department, as determined by us in our sole discretion. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. The length of the remedial training could be up to five (5) days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4  **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer

discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use Basic Reservation Fees we collect as part of allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance and support for any software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation. The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology. All information you collect or capture through your property management system shall be jointly owned by you and us. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

4.3 **Marketing.**

4.3.1 We will use Marketing Contributions we collect as part of the RINA Services Assessment Fees to promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the Marketing Contributions to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to

you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We may issue a Chain Directory in paper, electronic or other format. We will include the Facility in this Chain Directory if (i) you submit the information we request on time, and (ii) you are not in default under this Agreement at the time we must compile the information for the Directory. If the Directory is issued in paper form, we may supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.3.4 We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fees.

4.4 **Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards. We may offer optional architectural and design services for the Facility for a separate fee.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation where it appears.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium. We will provide you with access to the System Standards Manual promptly after we sign this Agreement. We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.6. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the fifteenth (15th) Franchise Year. However, each of us has the right to terminate this Agreement, without cause, and as a matter of right, on the 5th or 10th anniversary of the Opening Date by giving prior written notice to the other, provided that if you decide to exercise your right to terminate this Agreement, you must have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of a property management system or Reservation System) as of the date you provide notice of termination and as of the effective date of the termination. The written notice required by this Section 5 shall be given at least 6 months, but not more than twelve (12) months, before the date of the proposed termination. You will pay no Liquidated Damages if you comply with the terms of this Section and you perform the post termination obligations specified in this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Application and Initial Fees.** You must pay us a non-refundable Application Fee of $1,000.00. If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee. If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee. The amount of your Initial or Relicense Fee is $17,500.00 which shall be paid when you sign this Agreement and is fully earned when we sign this Agreement.

7. **Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Recurring Fees described in this Section 7.1 are payable ten days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the time set forth in the System Standards. Recurring Fees include the following:

7.1.1 A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "RINA Services Assessment Fee" as set forth in Schedule C, including a "Marketing Contribution" for advertising, marketing, training, and other related services and programs, and a "Basic Reservation Fee" for the Reservation System, accrues from the Opening Date until the

end of the Term, including during reservation suspension periods. We collect and deposit these Fees from franchisees, then disburse and administer the funds collected by means of a separate account or accounts. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services. You will also pay or reimburse us as described in Schedule C "Additional Fees" such as commissions we pay to travel and other agents paid for certain reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks, and fees for additional services and programs. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may change, modify, add or delete the RINA Services Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

**8. Indemnifications.**

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.  We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.  You will cooperate with our defense and resolution of the claim.  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

9.  **Your Assignments, Transfers and Conveyances.**

9.1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3.  Your Franchise is subject to termination when the Transfer occurs.  The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility.  The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13.  You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.**  You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000.  Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may, in our discretion, require the transferee to place funds in escrow, at its expense, in order to complete all necessary renovations. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or

that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.6, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection. If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection. We may terminate this Agreement and any or all rights granted hereunder if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing

process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

**11.3 Casualty and Condemnation.**

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2 You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3 Any protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4 **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due

under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5 **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

**12. Liquidated Damages.**

12.1 Generally. If we terminate the Franchise under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two Franchise Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.4, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two Franchise Years, Liquidated Damages will be **as set forth in Section 18.4.** If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13. Your Duties At and After Termination.** When a Termination occurs for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.6 (as to audits, for 2 years after termination), 3.11, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.

**14. <u>Your Representations and Warranties.</u>** You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the

RAMEXC1
223630 Q1 08

Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

15. <u>Proprietary Rights</u>.

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent. You will assign to us any such identification at

our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16. **Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or
agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

17. **Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in

writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Worldwide Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration; Fax No. (973) 753-8311

Your name: INN AT THE WICKLIFFE, LLC
Your address: 6702 Heritage Court, Chattanooga, TN 37416
Attention: Nick Sheth; Your fax No.: 423-894-2428.

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.


17.6 **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5 Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action. You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

**17.7 Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our Franchise Disclosure Document for prospective franchisees ("FDD") at least 14 days before signing this Agreement or paying the Initial Fee to us.**

**17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

**17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise.**

**17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement.**

**17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8 **Force Majeure.** Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected. Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected

party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

17.9 **Protected Territory.** We will not own, operate, lease, manage,franchise or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) ~~any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate franchises or licenses the facility, and/or~~ (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed. You acknowledge that the Protected Territory fairly represents the Facility's trading area and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section. You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **a area to include a five mile radius from the front door of the Facility**.

**18. Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 **Prior Affiliation**. Notwithstanding anything to the contrary, you agree that, prior to the Opening Date, you will provide us with a copy of the written termination notice or other written evidence satisfactory to us in our sole discretion that any prior hotel affiliation has terminated before we will cause the Opening Date to occur. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if you do not provide

satisfactory proof of termination of the prior hotel affiliation prior to the Opening Date.

18.2.  **Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the RINA Services Assessment Fee (excluding commissions and related service charges, Internet fees, the Loyalty Program Charge, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18.2.1  The Combined Fee shall be six and one half percent (6.5%) of Gross Room Revenues accruing during the first License Year; and

18.2.2  The Combined Fee shall be seven and one half percent (7.5%) of Gross Room Revenues accruing during the second and third License Years; and

18.2.3  The Royalty and RINA Services Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the third License Year.

18.2.4  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 125 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 125 in a re-inspection to be performed not less than 60 days after the initial inspection.

In exchange for our agreement to a reduced Combined Fee as set forth herein, you expressly waive your right to terminate this Agreement on the fifth or tenth anniversary of the Opening Date as set forth in Section 5 of this agreement.

18. 3     Each of us has the right to terminate this Agreement, without cause, and as a matter of right, on the fifth or tenth anniversaries of the Opening Date, by giving prior written notice to the other, provided, that if you decide to exercise your right to terminate this Agreement, you must have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of a property management system or Reservation System) as of the date you provide notice of termination and as of the effective date of the termination. The written notice required by this Section shall be given at least 6 months, but not more than twelve (12) months, before the date of the proposed termination. You will pay no Liquidated Damages if you comply with the terms of this Section and you perform the post termination obligations specified in this Agreement.

18.4  **Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two Franchise Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

In consideration for our agreement to reduce the Liquidated Damages as set forth herein, you expressly waive your right to terminate this Agreement on the fifth or tenth anniversary of the Opening Date as set forth in Section 5.

18.5　　**Demolition of Guest Rooms.** Pursuant to Schedule B, you are currently authorized to open 213 guest rooms at the Facility (the "Franchised Rooms"). We understand that you may wish, in the future, to modify the Location by demolishing seventy six (76) guest rooms (the "Demolition"). We agree to such Demolition provided (a) that you submit within sixty (60) days prior to the Demolition a proposal and plans for the Demolition; (b) such Demolition occurs within the first three Franchise Years; (c) the remaining one hundred and thirty seven (137) guest rooms of the Facility will be maintained and comply with the System Standards at all times including during any Demolition; (d) to the extent that the Demolition requires the closing of any rooms for renovation, those rooms will contain no Marks, Mark-bearing supplies or materials, or any other System identification and such rooms will not be reopened without our express written approval; (e) you will conduct any and all renovations for the remaining portion of the Facility to ensure that the Facility operates in accordance with System Standards; and (f) you will take all necessary safety precautions during the Demolition of any part of the Facility. In the event of a Demolition pursuant to this section, you agree to enter into an Amendment to revise Schedule B to reflect that the Facility contains 213 "Franchised Rooms" and 137 "Open Rooms." You further agree that, in the event of any early termination of the Agreement, except as under Section 11.3, you will be liable for Liquidated Damages as set forth in Section 18.4 based on the number of Franchised Rooms as set forth on the revised Schedule B.

IN WITNESS WHEREOF, the parties have executed this Agreement on this ____ day of ____________, 20____ and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

**WE:**
**RAMADA WORLDWIDE INC.:**

By:______________________
Vice President

**YOU,** as franchisee:
**INN AT THE WICKLIFFE, LLC**

By:______________________
Manager

IN WITNESS WHEREOF, the parties have executed this Agreement on this 20 day of June, 2008 and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

**WE:**
**RAMADA WORLDWIDE INC.:**

By:______________________________
Vice President

**YOU,** as franchisee:
**INN AT THE WICKLIFFE, LLC**

By:______________________________
Manager

**APPENDIX A**

DEFINITIONS

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

Basic Reservation Fee means the fees set forth in Section 7.1.2 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RJNA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Franchise means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

Franchise Year means:

(i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6, if the Agreement is for a new construction or conversion franchise.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 28600 Ridgehills Drive, Wickliffe, OH 44092, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.14.

Opening Date has the meaning specified in Schedule D.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities.

Punch List means the list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3.1 and Schedule D.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee pays to us when aTransfer occurs or the fee you pay to us if you are renewing an existing franchise.

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation Service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Ramada Worldwide Inc., a Delaware corporation, its successors and assigns.

**SCHEDULE A**

**(Legal Description of Facility)**

Stewart Title Guaranty Company

Commitment Number: 248045

SCHEDULE A

1. Commitment Date: October 25, 2007 at 07:29 AM
2. Policy (or Policies) to be issued:
   (a) Owner's Policy ( ALTA Own. Policy (06/17/06) )
   Proposed Insured:
   Shakti Krupa, Inc., a Georgia Corporation
   (b) Loan Policy ( ALTA Loan Policy (06/17/06) )
   Proposed Insured:
3. The estate or interest in the land described or referred to in this Commitment is:
   Fee Simple
4. Title to the Fee Simple estate or interest in the land is at the Effective Date vested in:
   Ridgehills Hotel Limited Partnership
5. The land referred to in this Commitment is described as follows:

Situated in the City of Wickliffe, County of Lake and State of Ohio, and known as be Willoughby Township Lot No. 3, Tract No. 8 and further bounded and described as follo

Beginning at the point of intersection of the centerline of Bishop Road (60 feet wide Corporation line between the City of Wickliffe and the Village of Willoughby Hills; then East along said centerline of Bishop Road, 27.19 feet to a point on the Southerly Right— Euclid Spur, also known as S.R. 525; thence North 77° 06' 33" West along said Southe Line of Euclid Spur, 202.61 feet to a point; said point being the northeasterly corner o Ridgehills Estates Subdivision as recorded in Volume O, Page 63 of Lake County Recor also the principal place of beginning of the premises herein intended to be described:

Course I Thence continuing North 77° 06' 33" West along said Southerly Right-of-W Spur and also along the Northerly line of said Ridgehills Estates Subdivision, 434.32 fe

Course II Thence North 61° 18' 40" West along said Southerly Right-of-Way Line of t also along the Northerly line of said Ridgehills Estates Subdivision, 444.09 feet to a poi

Course III Thence South 0° 01' 55" East 422.69 feet to a point;

Course IV Thence South 89° 58' 05" West 45.00 feet to a point;

Course V Thence South 0° 01' 55" East 160.00 feet to a point on the Southerly line Estates Subdivision;

Course VI Thence North 89° 58' 05" East along said Southerly line of Ridgehills Estat 842.68 feet to a point;

Course VII Thence North 3° 08' 30" East 272.56 feet to the principal place of beginnir 7.4905 acres of land. And further known as being Sublot No. 1 in Ridgehills Estates as Resubdivision as recorded in Volume P of Maps, Page 82 Lake County Records, being th less, but subject to all legal highways.



Stewart Title Guaranty Company

Commitment Number: 248045

**SCHEDULE A**

1. Commitment Date: October 25, 2007 at 07:29 AM

2. Policy (or Policies) to be issued: Amount

   (a) Owner's Policy (ALTA Own. Policy (06/17/06) ) $ 5,000,000.00
   Proposed Insured:
   Shakti Krupa, Inc., a Georgia Corporation

   (b) Loan Policy (ALTA Loan Policy (06/17/06) )
   Proposed Insured:

3. The estate or interest in the land described or referred to in this Commitment is:
   Fee Simple

4. Title to the Fee Simple estate or interest in the land is at the Effective Date vested in:
   Ridgehills Hotel Limited Partnership

5. The land referred to in this Commitment is described as follows:

Situated in the City of Wickliffe, County of Lake and State of Ohio, and known as being part of Original Willoughby Township Lot No. 3, Tract No. 8 and further bounded and described as follows:

Beginning at the point of intersection of the centerline of Bishop Road (60 feet wide) with the Corporation line between the City of Wickliffe and the Village of Willoughby Hills; thence North 3° 08' 30" East along said centerline of Bishop Road, 27.19 feet to a point on the Southerly Right-of-Way Line of Euclid Spur, also known as S.R. 525; thence North 77° 06' 33" West along said Southerly Right-of-Way Line of Euclid Spur, 202.61 feet to a point; said point being the northeasterly corner of Sublot 69 of the Ridgehills Estates Subdivision as recorded in Volume O, Page 63 of Lake County Records, said point being also the principal place of beginning of the premises herein intended to be described:

Course I Thence continuing North 77° 06' 33" West along said Southerly Right-of-Way Line of the Euclid Spur and also along the Northerly line of said Ridgehills Estates Subdivision, 434.32 feet to a point;

Course II Thence North 61° 18' 40" West along said Southerly Right-of-Way Line of the Euclid Spur and also along the Northerly line of said Ridgehills Estates Subdivision, 444.09 feet to a point;

Course III Thence South 0° 01' 55" East 422.69 feet to a point;

Course IV Thence South 89° 58' 05" West 45.00 feet to a point;

Course V Thence South 0° 01' 55" East 160.00 feet to a point on the Southerly line of said Ridgehills Estates Subdivision;

Course VI Thence North 89° 58' 05" East along said Southerly line of Ridgehills Estates Subdivision, 842.68 feet to a point;

Course VII Thence North 3° 08' 30" East 272.56 feet to the principal place of beginning and containing 7.4905 acres of land. And further known as being Sublot No. 1 in Ridgehills Estates as shown by the Resubdivision as recorded in Volume P of Maps, Page 82 Lake County Records, being the same more or less, but subject to all legal highways.

## Exhibit A

**ADDRESS**

28600 Ridgehills Drive
Wickliffe, Ohio 44092
Permanent Parcel No.(s) 29-B-010-J-00-001-0
Order No 248045

**LEGAL DESCRIPTION**

Situated in the City of Wickliffe, County of Lake and State of Ohio, and known as being part of Original Willoughby Township Lot No. 3, Tract No. 8 and further bounded and described as follows:

Beginning at the point of intersection of the centerline of Bishop Road (60 feet wide) with the Corporation line between the City of Wickliffe and the Village of Willoughby Hills;  thence North 3° 08' 30" East along said centerline of Bishop Road, 27.19 feet to a point on the Southerly Right-of-Way Line of Euclid Spur, also known as S.R. 525;  thence North 77° 06' 33" West along said Southerly Right-of-Way Line of Euclid Spur, 202.61 feet to a point;  said point being the northeasterly corner of Sublot 69 of the Ridgehills Estates Subdivision as recorded in Volume O, Page 63 of Lake County Records, said point being also the principal place of beginning of the premises herein intended to be described:

Course I    Thence continuing North 77° 06' 33" West along said Southerly Right-of-Way Line of the Euclid Spur and also along the Northerly line of said Ridgehills Estates Subdivision, 434.32 feet to a point;

Course II    Thence North 61° 18' 40" West along said Southerly Right-of-Way Line of the Euclid Spur and also along the Northerly line of said Ridgehills Estates Subdivision, 444.09 feet to a point;

Course III    Thence South 0° 01' 55" East 422.69 feet to a point;

Course IV    Thence South 89° 58' 05" West 45.00 feet to a point;

Course V    Thence South 0° 01' 55" East 160.00 feet to a point on the Southerly line of said Ridgehills Estates Subdivision;

Course VI    Thence North 89° 58' 05" East along said Southerly line of Ridgehills Estates Subdivision, 842.68 feet to a point;

Course VII    Thence North 3° 08' 30" East 272.56 feet to the principal place of beginning and containing 7.4905 acres of land.  And further known as being Sublot No. 1 in Ridgehills Estates as shown by the Resubdivision as recorded in Volume P of Maps, Page 82 Lake County Records, being the same more or less, but subject to all legal highways.

LIMITED WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS, that RIDGEHILLS HOTEL LIMITED PARTNERSHIP, an Ohio limited partnership (the "Grantor"), who claims title by or through instrument recorded in Volume 391, Page 898 of Lake County, Ohio, Records, for Ten Dollars and other valuable consideration received, grants with limited warranty covenants to INN AT THE WICKLIFFE, LLC, an Ohio limited liability company (the "Grantee"), whose tax mailing address will be c/o The Loan Depot, LLC, 6702 Heritage Business Court, Chattanooga, Tennessee 37421, that certain real property situated in the City of Wickliffe, County of Lake, State of Ohio and more particularly described on Exhibit A attached hereto and made a part hereof, together with all appurtenant rights, privileges and easements thereunto belonging (collectively, the "Premises"), SUBJECT HOWEVER, to the following:

(i) zoning ordinances and regulations;

(ii) real estate taxes and assessments, both general and special, which are a lien but are not yet due and payable;

(iii) Plat Easements, shown on Plat recorded in Volume O of Maps, Page 63 of Lake County Records;

(iv) Affidavit pursuant to Ohio Revised Code Section 5301.252 from Selaurum II Limited, filed for record June 8, 1988 and recorded in O.R. Volume 391, Page 895 of Lake County Records;

(v) Easement from Andrew Rosenfeld, Trustee and Thorpe Realty Co., Inc. to The city of Wickliffe, dated November 11, 1969, filed for record October 19, 1970 and recorded in Volume 859, Page 17 of Lake County Records;

(vi) Rights or claims of parties in possession not shown by the public records;

(vii) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Premises that would be disclosed by an accurate and complete land survey of the Premises;

(viii) The Premises described abuts Euclid Spur (S.R. 525) aka I-90, a Limited Access Highway;

(ix) Easement Rights of public utilities and others, if any, within that part of vacated Ridgehills Drive as shown in Plat Volume P, Page 81 of Lake County Records;

(x) Acceptance and Dedication Recital shown in the Plat of the Resubdivision No. 1 of Ridgehills Estates recorded in Plat Volume P, Page 82 of Lake County Records;

U S TITLE AGENCY, INC.
248045
COPY

CLI-1610463v2

2008R020028
LAKE COUNTY OHIO
RECORDED ON
07/18/2008 01:49:14PM
FRANK A SUPONCIC,CPA,CFE
LAKE COUNTY RECORDER
REC FEE: $44.00
PAGES: 5

COPY

(xi)    Pole Line Easement Agreement by and between Ridge-Hills Development Co. and the Cleveland Electric Illuminating Company, filed for record September 18, 1964 in Volume 628, Page 348 of Lake County Records;

(xii)    Disclaimer of Easement Rights by The Cleveland Electric Illuminating Company, filed for record August 6, 1969 in Volume 778, Page 522 of Lake County Records;

(xiii)    Memorandum of Lease between Ridgehill Limited Partnership, Lessor and Roy George Music & Vending Corp., Lessee, filed for record May 11, 1992 in Volume 719, Page 548 of Lake County Records;

(xiv)    Sign Agreement by and among Ridgehills Hotel Limited Partnership, an Ohio limited partnership, and CA II, LLC, an Ohio limited liability company, and First Security Bank, National Association, not individually but solely as Owner Trustee under the AutoNation Trust 1996-1, filed for record December 21, 1998 as Instrument Number 980058895 of Lake County Records;

(xv)    Purchase Money Mortgage Deed and Security Agreement securing the principal sum of $4,000,000, granted by Grantee to Grantor and intended to be filed for record in Lake County, Ohio, on the same day that this Deed is filed for record;

(xvi)    Rights of the public in and to the right of way of Ridgehills Drive; and

(xvii)    Any matter affecting title occurring, arising, or filed from or after May 2, 2008.

TO HAVE AND TO HOLD the Premises unto the Grantee, its successors and assigns, in fee simple forever.

IN WITNESS WHEREOF, the Grantor has executed this Limited Warranty Deed as of May 2, 2008.

RIDGEHILLS HOTEL LIMITED PARTNERSHIP, an Ohio limited partnership

By Ridgehills Hotel Corporation, its Managing General Partner

By: [signature]
Robert L. Stark
President

STATE OF OHIO )
) ss:
COUNTY OF CUYAHOGA )

The foregoing instrument was acknowledged before me this 23rd day of April, 2008, by Robert L. Stark, President of Ridgehills Hotel Corporation, an Ohio corporation and the Managing General Partner of Ridgehills Hotel Limited Partnership, an Ohio limited partnership, on behalf of the limited partnership.

[signature]
Notary Public

NOTARIAL SEAL STATE OF OHIO
THOMAS A. FITZSIMMONS,
ATTORNEY AT LAW
NOTARY PUBLIC – State of Ohio
My commission has no expiration date.
Section 147.03 O.R.C.

This instrument prepared by:

Richard L. Reppert, Esq.
Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114

## SCHEDULE B

PART I: YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|---|---|---|---|
| Meeta Sheth | 50% | Member | |
| Ghanshyam Patel | 50% | Manager | |

PART II: THE FACILITY:

Primary designation of Facility: Ramada Plaza

Number of approved guest rooms: 213

Parking facilities (number of spaces, description): 213

Other amenities, services and facilities: None

Initial

Initial

OH Wickliffe Holiday Inn CV RP

Tier: Plaza Hotel

Ramada Worldwide, Inc.
Punchlist for Conversion
"Schedule B part III"
May 7, 2008
Revised June 19, 2008

RAMADA WORLDWIDE

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Property Name: | Holiday Inn | # of Rms | 208 | 12 | (width) | X | 26 | (length) | = | 312 | sq. ft | Total rooms: | 213 |
| Property Address: | 28600 Ridgehills Dr. | # of Rms | 5 | 24 | (width) | X | 26 | (length) | = | 624 | sq. ft | Rentable | 213 |
| City: | Wickliffe | # of Rms | | | (width) | X | | (length) | = | | sq. ft | | |
| St: | OH | # of Rms | | | (width) | X | | (length) | = | | sq. ft | Kings | 134 |
| Zip: | 44092 | # of Rms | | | (width) | X | | (length) | = | | sq. ft | Queens | 20 |
| Conversion Consultant: | John M. Fair | # of Rms | | | (width) | X | | (length) | = | | sq. ft | Double/Double | 59 |
| Owner/ Applicant | Nick Sheth | # of Rms | | | (width) | X | | (length) | = | | sq. ft | | |
| Owner Phone: | (423) 593-5482 | # of Rms | | | (width) | X | | (length) | = | | sq. ft | | |
| Salesperson: | Stan Sanders | Room Dimension Standard: 268 SF | | | | | | | | | | | |
| Phone: | (404) 259-8997 | Rooms inspected: 207, 233, 252, 155, 345, 451, 555, 665, 667, 651, 562, 333, 530, 331 | | | | | | | | | | | |

This 34 year-old facility consists of one rectangular-shaped, 2-story, interior corridor guestroom and commercial building and one rectangular-shaped, 5-story, interior-corridor guestroom tower. The buildings are connected via common areas and are of concrete block construction with brick facades with synthetic stucco accents and trim. Both buildings feature parapet rooflines. The property will require exterior, public area and guestroom/bath renovations to comply with System Standards. Landscaping will require upgrading to enhance curb appeal. The property is located off of I-90 approximately 30 miles Northeast of the Cleveland International Airport. The market is predominately corporate and transient/leisure traffic. There are no other franchised properties in the immediate area.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lobby | 48 | (width) | X | 48 | (length) | = | 2304 | sq. ft | 800 SF | | |
| Restaurant | 24 | (width) | X | 30 | (length) | = | 720 | sq. ft | N/A | | |
| Lounge | 60 | (width) | X | 32 | (length) | = | 1920 | sq. ft | N/A | | |
| Meeting Room | | (width) | X | | (length) | = | 6020 | sq. ft | N/A | combined space | all rooms |
| | | (width) | X | | (length) | = | | sq. ft | | | |
| | | (width) | X | | (length) | = | | sq. ft | | | |
| | | (width) | X | | (length) | = | | sq. ft | | | |
| | | (width) | X | | (length) | = | | sq. ft | | | |

All items in this punchlist are required to be completed no later than 90 days of opening, unless otherwise noted. Time extensions in no way imply a waiver. All items will continue to be evaluated on condition, appearance and adherence to System Standards.

**ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST. PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE**

The Punchlist identifies actions needed to cause the Facility to meet the Franchisor's standards. You are solely responsible for compliance of the Facility with applicable federal, state and local laws, codes, ordinances and regulations. You have been provided a Punchlist Reference Guide to assist in compliance with punchlist completion and Brand Standards. This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet our Standards, or comply with law, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date.

Failure to comply with specified deadlines for completing items may result in default under your franchise agreement and reservation service suspension

Revisions - All Previous Copies are Invalid

06/19/2008 sg 06/18/2008 sg/mjy

Signed: ____________ Date: ____________

Print Name: Nick Sheth, CFO

Initials: N

(Page 43 of 56) Case 2:15-cv-03975-WHW-CLW Document 1 Filed 06/12/15 Page 65 of 130 PageID: 65

Sent By: Wyndham Hotel Group; 404 240 0962; Jun-27-08 11:25AM; Page 3/7

File Name:

Page 2

| Brand Variances Continued | For Office Use Only |
|---|---|
| The existing secondary access stairwell concrete block walls are acceptable if condition is maintained. | |
| Existing 25" and 27" television units are acceptable at this time. 32" flat panel High Definition LCD TVs (37" televisions are highly recommended) will be required in all guest rooms after January 1, 2010. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Initials: [signature]

| Exterior | | |
|---|---|---|
| Prior to opening | Provide Company approved signage. Signage must be purchased or leased and must be manufactured by Persona Inc. Signage may not be installed without prior written approval. Your License Agreement controls your use of signage and timing of installation. All existing signage (building, high-rise, channel letters, billboards, etc.) must be removed. | |
| Prior to opening | Pressure wash building brick facade. | |
| 90 days after opening | Recoat/paint/refinish synthetic stucco trim per manufacturer's specifications at commercial area secondary entrance to eliminate areas of mismatched paint/color. One consistent color scheme is required. | |
| 90 days after opening | Refinish patio. | |
| 90 days after opening | Replace patio furniture. Company requires one consistent style of furniture throughout the patio area. | |
| 90 days after opening | Hot patch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. | |
| 90 days after opening | Paint parking area light pole bases. | |
| 30 days after opening | Upgrade landscaping by providing additional shrubs, flowers and groundcover in the existing landscaped beds and landscaped areas. Provide potted plants and/or planter boxes with flowers at the porte cochere/lobby entrance and secondary entrances. Manicure existing landscaping and maintain a regular grooming schedule. | |
| **Public Areas** | | |
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| 90 days after opening | Provide a property management system per System Standards. | |
| 90 days after opening | All owners/general managers are required to attend all Brand orientation/training. | |
| 90 days after opening | Property manager is required to be WyndhamRewards certified and property must fully comply with all WyndhamRewards requirements. | |
| Prior to opening | Provide a voicemail system, safe deposit boxes, complimentary USA Today® newspapers, logo'd keycards with the 800 reservations number and web address, valet laundry service, bell desk service, a gift/sundry shop, business center, fitness room and a whirlpool or Jacuzzi. | |
| Prior to opening | Provide Complimentary wireless, high-speed internet access in all guestrooms from an approved Vendor (i.e. Deep Blue and Ethostream). | |
| 90 days after opening | Ramada Plaza Hotels are designed to provide an upscale, luxurious setting. All renovations are to include the use of upgraded materials (i.e. marble, brass, upscale fabrics, etc.). | |
| March 31, 2009 | Compact fluorescent energy saving light bulbs are required to be installed in all areas of the hotel, including guestrooms, lobby and back of the house. | |
| 30 days after opening | Remove toilet seat/lid unit(s) in lobby area public restrooms. A toilet seat only is required in public facilities; lids are not acceptable. | |
| 90 days after opening | Replace stairwell carpet and landing area VCT flooring. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. VCT flooring is not acceptable. | |
| 90 days after opening | Prep, prime and paint secondary access stairwell railings. | |
| 90 days after opening | Replace elevator cab flooring. A surface designed for commercial traffic is required. | |
| 90 days after opening | Refinish elevator cab walls to a like-new condition. | |
| 90 days after opening | Replace corridor carpet. Company requires minimum 32 ounce cut pile carpet with padding. Carpet must be designed for commercial traffic. | |
| 90 days after opening | Replace/install corridor wall covering. Company requires 20 ounce vinyl wall covering. Multi-spec wall finishes are not acceptable in public areas. | |
| 90 days after opening | Replace signage package in all public areas, to include room number plaques, with a professionally produced and displayed package. | |
| 90 days after opening | Replace/repair inoperable ice machine. | |

Initials: [illegible]

| | Public Areas continued | |
|---|---|---|
| Prior to opening | Provide a business center that provides copying capability, computer with word processing program, printer fax machine, minimum 2-phone with data ports, free access to 800 numbers, office supplies (i.e. pens, pads, stapler, etc.). Minimum required hours of operation are between 8AM to 8PM. Submit plans and colorboards to Design and Construction Services for approval prior to commencement of work. | |
| Prior to opening | Currently the exercise room facility does not meet System Standards. Exercise room facility is required to provide the following: Minimum one treadmill and one multi-station weight machine with two additional exercise machines (additional two units should be 'state of the art' aerobic equipment approved by Ramada.), minimum 27" flat screen HDTV wall/ceiling mounted TV, weight scale, three coat/towel hooks, telephone with direct dial to front desk, full view wall mirror, fresh towels, soiled linen disposal and a water cooler. | |
| Prior to opening | All exercise equipment must be maintained and inspected as per the manufacturer guidelines and emergency instructions, assumed liability signage and guest use only signage must be prominently displayed in the exercise room. | |
| 90 days after opening | Restore sauna wood finishes, to include door and trimwork, to a like-new condition. | |
| Prior to opening | Ensure pool safety and security items, pool furniture, condition of deck, etc. meet all System Standards. | |
| Prior to opening | Maintain clear water appearance in the swimming pool and whirlpool with routine maintenance and the proper use of chemicals. | |
| 90 days after opening | Paint swimming pool surface and horizontal coping. | |
| 90 days after opening | Repair/refinish swimming pool deck. | |
| 90 days after opening | Replace swimming pool furniture package. A minimum of 4 umbrella tables, 16 chairs and 10 chaise lounges are required. | |
| 90 days after opening | Prep, prime and paint swimming pool gate. | |
| 90 days after opening | Replace/repair whirlpool to ensure proper operation. Paint whirlpool surface and install FT. and depth marking at the whirlpool per System Standards. | |
| 90 days after opening | Paint/refinish pool area public restroom doors to include trimwork. | |
| 90 days after opening | Replace pool area public restroom wall tiles and cove base to eliminate any that are damaged. Ensure all replacements match existing tiles in style, color and texture. If replacements do not match total replacement will be required. | |
| 90 days after opening | Prep, prime and paint pool area public restroom toilet stalls. | |
| 90 days after opening | Replace pool area public restroom vanities. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. Ensure vanities have adequate skirting and a concealed support system. | |
| | **Food and Beverage** | |
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Ensure the food and beverage facilities are in compliance with all state, city and local codes. | |
| | Currently the restaurant is open from 6:00 AM to 11:00 PM daily. The lounge is open from 5:00 PM to 2:30 AM daily and serves a pub menu. The restaurant and lounge are operated by the property. | |
| Prior to opening | Ramada Plazas are designed to be full service properties. They are required to have a full menu service restaurant with 3 meal periods, a lounge and meeting room facilities to include a boardroom. Room service is required. | |
| Prior to opening | Table linen service in the restaurant for the evening meal period is required. | |
| Prior to opening | Provide Room Service from 7:00 am till 10:00 pm daily. 24-hour room service is recommended. | |
| Prior to opening | Lounge entertainment or special theme is strongly recommended. | |
| ~~Prior to opening~~ | ~~Ramada Plaza Hotels must have a meeting room that can accommodate a minimum of 100 people with an unobstructed view of the speaker's table.~~ | |
| 90 days after opening | A boardroom with minimum seating for 16 to be equipped with the following: wet bar, under-counter refrigerator, built-in china storage, blackboard and movie screen is required. | |
| 90 days after opening | Additional facilities recommended include recreational facilities (tennis, enclosed pool, etc.) and expanded meeting/convention facilities. | |

Initials: [illegible]

| Food and Beverage continued | | |
|---|---|---|
| 90 days after opening | Ensure meeting facilities provide a comfortable and pleasing yet business-like atmosphere. Furnishings and fixtures must be color coordinated and in accordance with System Standards. | |
| 90 days after opening | Replace meeting facility public restroom flooring. Company requires minimum 6" - 8" ceramic tile. 2" tile is not acceptable. | |
| 90 days after opening | Replace vanities in the meeting facility public restrooms. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. Ensure vanities have adequate skirting and a concealed support system. | |
| 90 days after opening | Prep, prime and paint toilet stalls in the meeting facility public restrooms. | |
| 90 days after opening | Ensure sundry mart meets System Standards and is stocked per Ramada specifications. | |
| **Guestrooms** | | |
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required | |
| 90 days after opening | Provide night lights, full-length mirrors, removable wooden hook style hangers, UL trashcans, AM/FM alarm clock radios, coffee makers, data port telephones, irons and full size boards, hairdryers, sheer drapes, and all required supplies. Complimentary premium movie, sports/news channels is required in addition to all major network channels. Pay-Per-View service is required. A minimum of 50% of guestrooms must be designated as non-smoking. | |
| 90 days after opening | Provide Complimentary wireless, high-speed internet access in all guestrooms from an approved Vendor (i.e. Deep Blue and Ethostream). | |
| 90 days after opening | FF&E replacement must incorporate upscale materials. Upgraded softgoods, artwork, etc, must be used. | |
| September 30, 2008 | In room safes that are large enough to accommodate a 17" laptop computer and which use touch pads rather than keys will be mandatory in all guestrooms, with no additional charge to guest. | |
| September 30, 2009 | Microwave/refrigerator units are required to be installed in 20% of all guestrooms. New units must be enclosed in cabinetry that matches existing casegoods. | |
| September 30, 2009 | Compact fluorescent energy saving light bulbs are required to be installed in all areas of the hotel, including guestrooms, lobby and back of the house. | |
| March 31, 2009 | Ramada's specially designed and mandated Linen/Terry Reuse Water Savings Program must be implemented. | |
| January 1, 2010 | Currently Ramada requires 27" remote control televisions. However 32" flat panel high definition LCD televisions must be installed in every guestroom by January 1, 2010. 37" flat panel high definition LCD television units are highly recommended. | |
| 90 days after opening | Increase number of non-smoking guestrooms to minimum of 80% per new System Standards. At a minimum Ramada will require shampooing of carpet, drapes to be dry-cleaned, walls and furniture washed, removal of ashtrays and matches, and installation of non-smoking signage on entrance doors. | |
| Prior to opening | All furniture, finishes, fixtures, etc. must match within the guestroom. | |
| Prior to opening | Replace connecting door locks per System Standards where mismatched. The doors are self-locking with a knob on the room side only and blank plate on the opposite side as well as an independent non-keyed 1" deadbolt. | |
| 90 days after opening | Paint/refinish connecting room doors to include trimwork where scuffed as in rooms #207 #233. | |
| 90 days after opening | Replace/provide wallcovering where scuffed and/or seaming as in rooms #207 and #331. Company requires either vinyl wallcovering (minimum of 15 ounce) or an approved textured finish. The existing multi-spec wall finish in the tower wing guestrooms is acceptable if condition is maintained. | |
| 90 days after opening | Replace carpet. Company requires minimum 26 ounce cut pile carpet with padding. Carpet must also be wall to wall. | |
| 90 days after opening | Replace furniture package to include leisure chairs. Casegoods must be new upon installation. A minimum of one credenza, a framed wall mirror, one headboard per bed, and one free standing night stand for a two bedded room, two for a single bedded room is required. Two writing surfaces are required in each room to consist of a desk with ergonomic desk chair and an activity table with two comfortable fabric upholstered chairs. | |
| 90 days after opening | Replace sofa sleepers. | |
| 90 days after opening | Replace wetbar cabinet countertops in suite rooms. Granite, Corian or similar are acceptable replacement options. Laminate finishes are not acceptable. | |

Initials: [signature]

| Guestrooms continued | | |
|---|---|---|
| 90 days after opening | Replace lamp package. Provide two lamps per headboard wall, a credenza lamp and a floor lamp at leisure area. All wall-mounted lamps must have wire covers or molding, loose cords are not acceptable. Lamp package must be neutral and contemporary (i.e. brass). The use of red or other colors of anodized metal is not recommended. | |
| December 31, 2008 | Replace bed toppings with one of the Ramada approved bedding program options (Fitted coverlet, Duvet or Triple Sheet). Contact Design and Procurement Services for product specifications. | |
| 90 days after opening | Ensure complete inventory of linen to include sheets (flat and fitted), pillows and pillowcases and complete inventory of terry stock to include washcloths, bath mats and bath and hand towels meets System Standards. | |
| 90 days after opening | Replace existing bedsets (mattresses and boxsprings) with Serta Concierge Emerald® or Sealy Posturepedic Plush® bedsets per new System Standards. | |
| 90 days after opening | Construct closet area wing walls. Install closet doors in all closet areas. | |
| 90 days after opening | Replace vanities where worn or burned as in rooms #207 and #252. Corian or cultured marble are acceptable replacement options. Laminate finishes are not acceptable. Ensure vanities have adequate skirting and a concealed support system. | |
| 90 days after opening | Replace vanity mirrors where desilvered or improperly repaired as in room #333. Mirrors should extend the length of the vanity. | |
| 90 days after opening | Install Moen Revolution showerheads, the Arcs and Angles curved shower rods and Ramada specialty Hookless® shower curtains in all bath areas. | |
| 90 days after opening | Replace plumbing fixtures/trim (sinks and tubs) where tarnished as in rooms #233 and #656 (faucets, drains rings, etc.). | |
| Prior to opening | Provide "Relax Retreat" amenities per System Standards. | |
| Prior to opening | Removal of all previous affiliation guestroom supplies is required. | |

Initials: [illegible]

**RAMADA WORLDWIDE INC.**
**SCHEDULE C**
**March 2008**

**I. RINA Services Assessment Fee**

The RINA Services Assessment Fee consists of the "Marketing Contribution" and the "Basic Reservation Fee." The Marketing Contribution is 2.5% of Gross Room Revenues; the Basic Reservation Fee is 2% of Gross Room Revenues. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

**II. RMA Fee**

To provide additional regional marketing services through your Ramada Management Association or RMA, we have established a mandatory "RMA Fee". The RMA Fee is $15 per guest room per year, up to a maximum of $3,000 per year. The RMA Fee will be payable before the start of each year on a date we establish and communicate to you at least 60 days in advance, and will be fully earned once the year begins. The RMA Fee is subject to change for all Chain Facilities, but only upon the recommendation of the Executive Committee of RINA and our approval. Each RMA may elect to charge supplemental RMA Fees with our approval.

**III. Additional Fees**

A. **Loyalty Program Charge**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "qualifying stay" at the Facility as defined in the Front Desk Guide. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their Wyndham Rewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

B. **Guest Services Assessment**

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not resolve any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $100.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied room nights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the RINA Executive Committee, we will

charge you a "Processing Fee" of $60.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

C. **Best Available Rate Program**

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

D. **Service Interruption Fee**

If we suspend Central Reservation System Service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

E. **GDS and Internet Booking Fees**

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee, as applicable, for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. GDS Fees are assessed for reservations processed through any GDS or through any Internet website powered by a GDS. Internet Booking Fees are assessed for any other Internet-originated reservations. We do not currently charge any fees for reservations booked through our Chain website or through our direct connection to on-line travel agents. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee. GDS and Internet-originated reservations may also incur travel agent and similar commissions. We will establish the amount of the GDS and Internet Booking Fees from time to time based on a weighted average of the fees these distribution channels charge us plus a reasonable processing charge.

F. **Travel Agent Commissions and Other Distribution Charges**

Travel agent and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company may charge additional commissions and/or participation fees to be included in their programs. The general sales agent commission (also

known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the travel agent commission. The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .5% of commissionable revenue.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and RINA Services Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services and programs at any time upon not less than 30 days written notice.

**SCHEDULE D**
**ADDENDUM FOR CONVERSION FACILITIES**

This Addendum applies if you are converting an existing guest lodging facility to a Ramada Facility.

**1. YOUR IMPROVEMENT OBLIGATION:**

**1.1 Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Schedule D is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans and the Punch List. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary renovations. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 1.3 below and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

1.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 1.1 of this Schedule D (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors,

or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

1.3 **Pre-Opening**. You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 1.1 of this Schedule D and Sections 11.2 and 11.4 of the Agreement, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

**2. DEFINITIONS:**

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

**SCHEDULE D**
**ADDENDUM FOR CONVERSION FACILITIES**

**[Punch List Attached.]**

**GUARANTY**

To induce Ramada Worldwide Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

**Meeta Sheth**

**Ghanshyam Patel**

# EXHIBIT B

## GUARANTY

To induce Ramada Worldwide, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

______________________
Meeta Sheth

______________________
~~Gansam Patel~~
Ghanshyam Patel

RAMEXC1
223630 Q1 08

# EXHIBIT C



1X - QA to HSK

Wyndham Hotel Group
Franchise Administration
1 Sylvan Way
Parsippany, NJ 07054
973.753.6000 Phone
800.880.9445 Fax

April 10, 2009

**VIA OVERNIGHT COURIER**

Mr. Nick Sheth
Inn at the Wickliffe, LLC
6702 Heritage Business Court
Chattanooga, TN 37421
(423) 385-2500

UPS: 1Z22445X 02 9866 1143

**Re: NOTICE OF QUALITY ASSURANCE DEFAULT relating to Ramada® Unit #26455-77316-01 located in Wickliffe, OH (the "Facility")**

Dear Mr. Sheth:

I write on behalf of Ramada Worldwide Inc. ("we," "us," or "our") regarding the License Agreement dated June 27, 2008 between Inn at the Wickliffe, LLC ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to maintain the Facility according to System Standards. Our Quality Assurance Consultant conducted an inspection of the Facility on March 11, 2009. The Facility received a failing score of 870-F in the Inn segment of the inspection and an automatic failure in the housekeeping segment of the inspection. We will re-inspect the Facility after at least 90 days from the date of this Notice. If the Facility does not receive a passing quality assurance score at this re-inspection, the Agreement may be subject to termination. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility.

As you no doubt recall, the Agreement provides you with certain rights and benefits that in return, require you to cure any defaults under the Agreement within the time permitted. We remind you that if you fail to cure your default timely, your Special Combined Fees will expire automatically at the end of the cure period. You will then be obligated to perform your responsibilities under the Agreement for the remainder of the term.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default. By copy of this letter, we are also informing your guarantors of your default.














If you have not already done so, you will need to access your QA Evaluation & Improvement Plan (QAEIP) via MyPortal. We have attached step-by-step instructions on how to perform this action.

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact your Manager of Operations and Support at (800) 221-6770.

Sincerely yours,

Carole Lennon
Director
Contracts Administration

Enclosure

cc: Meeta Sheth (Guarantor)
Ghanshyam Patel (Guarantor)
Mark Young
Dan Shoen
Valerie Capers Workman

**Accessing QAEIP via My Portal**
**Step-by-Step Instructions**

**Step 1**       Log on to MyPortal at https://myportal.wyndhamworldwide.com

**Step 2**       Enter your user code and password.  If you have any problems logging in,
             please contact your Manager of Operations and Support.

**Step 3**       Click on the Reports tab

**Step 4**       Click drop-down filter labeled Report and select Latest Evaluation on drop
             down (your site number and brand information will be pre-populated) and
             click the GO button to the right (you may have to navigate your screen to
             see the GO button.

**Step 5**       The report will then be listed on your screen.  To view the report, click on
             the Adobe .pdf symbol  to view.

# EXHIBIT D



SPA

2X-QA

TERMINATE FEES

Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973.753.6000 Phone
800.880.9445 Fax

Nick Sheth
1611 Ashley Mill Drive
Chattanooga, TN 37421
423. 892. 1659

August 5, 2009

**VIA OVERNIGHT COURIER**

UPS: 1Z22445X 02 9696 2698

1Z22445X 02 9839 7301

Mr. Nick Sheth
INN AT THE WICKLIFFE, LLC
6702 Heritage Business Court
Chattanooga, TN 37421
(423) 385-2500

**RE: NOTICE OF CONTINUING QUALITY ASSURANCE DEFAULT RELATING TO RAMADA® UNIT #26455-77316-01 LOCATED IN WICKLIFFE, OH (THE "FACILITY")**

Dear Mr. Sheth:

I write on behalf of RAMADA WORLDWIDE INC. ("we", "us" or "our") regarding the License Agreement dated June 27, 2008 between INN AT THE WICKLIFFE, LLC ("you" or "your") and us (the "Agreement"). You will recall that on April 10, 2009, we sent you a default notice because of your failure to ensure that the Facility meets our quality assurance standards. That notice required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 1249-F on July 23, 2009.

The Agreement provided you with certain rights and benefits that in return, require you to cure any defaults under the Agreement within the time permitted. Because you failed to do so, your Special Combined Fees have expired. You must now perform your obligations under the Agreement for the remainder of the term.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Ramada facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after September 4, 2009. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 400 or less, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. Your Special Combined Fees, however, remain expired. Also, please be advised that if you do not enter into an acceptable improvement plan with our Quality Assurance Department by August 12, 2009, we may suspend the Facility's access to our central reservation system due to your default. By copy of this letter, we are also informing your guarantors of your default.













Please be advised that a copy of the QA Evaluation report was provided to you at the time of the inspection.

Also, enclosed is a Site Contact form. The Site Contact form is used to update the Site Contacts for the Facility and ensures that the contacts are current. Please complete the form and return to our attention by September 4, 2009 via regular mail or facsimile to (973) 753-8311.

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact Franchise Support at (800) 221-7312.

Sincerely yours,

Carole A. Lennon
Director
Contracts Administration

Enclosure

cc: Nick Sheth (Site Principle Address)
Meeta Sheth (Guarantor)
Ghanshyam Patel (Guarantor)
Mark Young
Dan Shoen
Valerie Capers Workman

**WYNDHAM HOTEL GROUP**
**CONTACT INFORMATION FOR SITE #: 26455-77316-01**
**LOCATED IN: WICKLIFFE, OH**
**HOTEL BRAND: RAM**

Please enter below the information for the person in your organization who you desire to have entered into our computer database for various mailings. Upon completion please return this form to **Wyndham Hotel Group: 22 Sylvan Way - Parsippany, NJ 07054, Attn: Contracts Administration, or via facsimile to 973-753-8311.** If you have any questions regarding this form, please contact your Manager of Operations and Support.

**Site Principal Contact: (SPR) (LEG)**

| Name: | |
|---|---|
| Title: | |
| Company: | |
| Address: | |
| | |
| Phone #: | |
| Fax #: | |
| Email: | |

**Guest Services Contact: (GUE)**

| Name: | |
|---|---|
| Title: | |
| Company: | |
| Address: | |
| | |
| Phone #: | |
| Fax #: | |
| Email: | |

**General Manager: (MGR)**

| Name: | |
|---|---|
| Title: | |
| Company: | |
| Address: | |
| | |
| Phone #: | |
| Fax #: | |
| Email: | |

**Invoice/Statement Contact: (INV) (STM)**

| Name: | |
|---|---|
| Title: | |
| Company: | |
| Address: | |
| | |
| Phone #: | |
| Fax #: | |
| Email: | |

**In order for changes to be made, this form must be signed below by someone listed as an owner on the Franchise Agreement.**

Authorized by: ______________________ ****(Must be signed by an Officer or Owner) ****
Signature

Print Name: ______________________

Title: ______________________

Date: ______________________

# **EXHIBIT E**



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973.753.6000 Phone
800.880.9445 Fax

December 2, 2009

**VIA OVERNIGHT COURIER**

Mr. Ghanshyam Patel
Inn at the Wickliffe, LLC
28600 Ridgehill Drive
Wickliffe, OH 44092

**Re: NOTICE OF CONTINUING QUALITY ASSURANCE DEFAULT relating to Ramada® Unit #26455-77316-01 located in Wickliffe, OH (the "Facility")**

Dear Mr. Patel:

I write on behalf of Ramada Worldwide Inc. ("we", "us" or "our") regarding the License Agreement dated June 27, 2008 between Inn at the Wickliffe, LLC ("you" or "your") and us (the "Agreement"). You will recall that, on April 10, 2009 and August 5, 2009, we sent you default notices because of your failure to ensure that the Facility meets our quality assurance standards. The notices required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 1750-F on November 4, 2009.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Ramada facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after January 2, 2010. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 400 or less, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. Also, please be advised that we have suspended the Facility's access to our central reservation system due to your default.

     

    

By copy of this letter, we are also informing your guarantor of your default.

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact Franchise Support at (800) 221-7312.

Sincerely yours,

Carole Lennon
Director
Contracts Administration

cc: Meeta Sheth (Guarantor)
Mark Young
Dan Shoen
Valerie Capers Workman

## Shipment Receipt

(Keep this for your records.)

**Transaction Date** 02 Dec 2009

**Address Information**

| **Ship To:** | **Shipper:** | **Ship From:** |
|---|---|---|
| Inn At The Wickliffe, Llc | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Ghanshyam Patel | Elena Danishevsky | Elena Danishevsky |
| Ramada | 973-753-7236 | 973-753-7236 |
| 28600 Ridgehill Drive | 22 Sylvan Way | 22 Sylvan Way |
| WICKLIFFE OH 44092-2788 | Parsippany NJ 07054 | Parsippany NJ 07054 |

**Shipment Information**

| | | |
|---|---|---|
| **Service:** | UPS 2nd Day Air | |
| *Guaranteed By: | End of Day, Fri. 4 Dec. 2009 | |
| **Fuel Surcharge:** | .................. | **0.60 |
| **Shipping:** | .................. | **10.05 |

**Package Information**

| | |
|---|---|
| **Package 1 of 1** | |
| Tracking Number: | 1Z22445X0299180054 |
| Package Type: | UPS Letter |
| Actual Weight: | Letter |
| Billable Weight: | Letter |
| Reference # 1: | 006-5072 |

**Billing Information**

| | | |
|---|---|---|
| **Bill Shipping Charges to:** | Shipper's Account 22445X | |
| **Total:** | **All Shipping Charges in USD** | ****10.65** |

**Note:** Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

** Detailed information on fuel surcharges is also available.

# EXHIBIT F



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973.753.6000 Phone
800.880.9445 Fax

April 28, 2010

**VIA OVERNIGHT COURIER**

Mr. Ghanshyam Patel
Inn at the Wickliffe, LLC
28600 Ridgehill Drive
Wickliffe, OH 44092

**Re:    NOTICE OF CONTINUING QUALITY ASSURANCE DEFAULT relating to Ramada® Unit #26455-77316-01 located in Wickliffe, OH (the "Facility")**

Dear Mr. Patel:

I write on behalf of Ramada Worldwide Inc. ("we", "us" or "our") regarding the License Agreement dated June 27, 2008 between Inn at the Wickliffe, LLC ("you" or "your") and us (the "Agreement"). You will recall that, on April 10, 2009, August 5, 2009 and December 2, 2009, we sent you default notices because of your failure to ensure that the Facility meets our quality assurance standards. The notices required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 1275-F on April 7, 2010.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Ramada facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after May 28, 2010. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 400 or less, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. Also, the Facility's access to our central reservations system has been suspended for outstanding quality assurance and monetary issues. Please be advised that the Facility's access to our central reservation system will remain suspended until both the quality assurance and monetary issues have been cured to our satisfaction.

     
    

By copy of this letter, we are also informing your guarantor of your default.

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact Franchise Support at (800) 221-7312.

Sincerely yours,

Carole Lennon
Director
Contracts Administration

cc: Meeta Sheth (Guarantor)
Mark Young
Dan Shoen
Valerie Capers Workman

## Shipment Receipt

(Keep this for your records.)

**Transaction Date** 28 Apr 2010

**Address Information**

**Ship To:**
Inn At The Wickliffe, Llc
Ghanshyam Patel
Ramada
28600 Ridgehill Drive
WICKLIFFE OH 44092-2788

**Shipper:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
973-753-7236
22 Sylvan Way
Parsippany NJ 07054

**Ship From:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
973-753-7236
22 Sylvan Way
Parsippany NJ 07054

**Shipment Information**

**Service:** UPS 2nd Day Air
*Guaranteed By: End of Day, Fri. 30 Apr. 2010

**Fuel Surcharge:** .................. **0.75

**Shipping:** .................. **10.65

**Package Information**

**Package 1 of 1**
Tracking Number: 1Z22445X0293807487
Package Type: UPS Letter
Actual Weight: Letter
Billable Weight: Letter
Reference # 1: 006-5072

**Billing Information**

**Bill Shipping Charges to:** Shipper's Account 22445X

**Total:** **All Shipping Charges in USD** ****11.40**

**Note**: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

** Detailed information on fuel surcharges is also available.

# EXHIBIT G



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973 753 6000 Phone
800 880 9445 Fax

July 7, 2010

**VIA 2 DAY DELIVERY METHOD**

Mr. Ghanshyam Patel
INN AT THE WICKLIFFE, LLC
28600 Ridgehill Dr.
Wickliffe, OH 44092

**RE: NOTICE OF CONTINUING QUALITY ASSURANCE DEFAULT RELATING TO RAMADA® UNIT #26455-77316-1 LOCATED IN WICKLIFFE, OH (THE "FACILITY")**

Dear Mr. Patel:

I write on behalf of RAMADA WORLDWIDE INC. ("we", "us" or "our") regarding the License Agreement dated June 27, 2008 between INN AT THE WICKLIFFE, LLC ("you" or "your") and us (the "Agreement"). You will recall that, on April 10, 2009, August 5, 2009, December 2, 2009, and April 28, 2010, we sent you default notices because of your failure to ensure that the Facility meets our quality assurance standards. The notices required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 1701-F on June 3, 2010.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Ramada facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after August 7, 2010. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 400 or less, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. Also, please be advised that if you do not enter into an acceptable improvement plan with our Quality Assurance Department, we may suspend the facility's access to our central reservation system due to your default. By copy of this letter, we are also informing your guarantor of your default.

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.













We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact Operation Support Desk at (800) 221-7312.

Sincerely yours,

Carole A. Lennon
Director
Contracts Administration

Enclosure

cc: Meeta Sheth (Guarantor)
Mark Young
Dan Shoen
Valerie Capers Workman

## Shipment Receipt

(Keep this for your records.)

**Transaction Date** 07 Jul 2010

**Address Information**

| Ship To: | Shipper: | Ship From: |
|---|---|---|
| Inn at the Wickliffe, LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Ghanshyam Patel | Beatriz Williams | Beatriz Williams |
| 28600 Ridgehill Dr. | 973-753-7205 | 973-753-7205 |
| WICKLIFFE OH 44092-2788 | 22 Sylvan Way | 22 Sylvan Way |
| | Parsippany NJ 07054 | Parsippany NJ 07054 |

**Shipment Information**

| | |
|---|---|
| **Service:** | UPS 2nd Day Air |
| *Guaranteed By: | End of Day, Fri. 9 Jul. 2010 |

| | |
|---|---|
| **Fuel Surcharge:** | **0.85 |
| **Shipping:** | **10.65 |

**Package Information**

**Package 1 of 1**

| | |
|---|---|
| Tracking Number: | 1Z22445X0298023556 |
| Package Type: | UPS Letter |
| Actual Weight: | Letter |
| Billable Weight: | Letter |
| Reference # 1: | 006-5072 |

**Billing Information**

**Bill Shipping Charges to:** Shipper's Account 22445X

| | | |
|---|---|---|
| **Total:** | **All Shipping Charges in USD** | ****11.50** |

**Note:** Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

** Detailed information on fuel surcharges is also available.

# EXHIBIT H



Wyndham Hotel Group
Franchise Administration
1 Sylvan Way
Parsippany, NJ 07054
973 753 6000 Phone
800 880 9445 Fax

March 25, 2011

**VIA 2 DAY DELIVERY METHOD**

Mr. Ghanshyam Patel
INN AT THE WICKLIFFE, LLC
28600 Ridgehill Drive
Wickliffe, OH 44092

**Re:** **NOTICE OF DEFAULT** - License Agreement dated June 27, 2008 (the "Agreement") between INN AT THE WICKLIFFE, LLC ("you" or "your") and Ramada Worldwide Inc. ("we", "us", or "our") relating to Ramada® Unit #26455-77316-1 LOCATED IN WICKLIFFE, OH (the "Facility")

Dear Mr. Patel:

You are in default under the Agreement for your failure to satisfy the required Quality Standards and your failure to meet your financial obligations. We will address each default in turn.

The Quality Assurance Default

The Agreement requires you to maintain the Facility according to System Standards. You will recall that, on April 10, 2009, August 5, 2009, December 2, 2009, April 28, 2010, July 7, 2010 and September 22, 2010, we sent you default notices because of your failure to ensure that the Facility meets our quality assurance standards. The notices required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 1752-F on December 21, 2010.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Ramada facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after April 25, 2011. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 400 or less, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period.

     
     

The Financial Default

The default arises from your failure to meet your financial obligations under the Agreement. Our Financial Services Department advises us that as of March 23, 2011 your account is past due in the amount of $161,588.37. We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have 30 days to pay this amount to us in order to cure your default. If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Ramada System.

By copy of this letter, we are also informing your guarantor of your defaults.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Also, please be advised that we have suspended the Facility's access to our central reservation system due to your defaults.

We hope you will take this opportunity to resolve your defaults. If you have any questions regarding your defaults or how they can be timely cured, please contact Operations Support Desk at (800) 221-7312.

Sincerely yours,

Suzanne Fenimore

Suzanne Fenimore
Director
Contracts Compliance, Legal

Enclosure

cc: Meeta Sheth (Guarantor)
Mark Young
Sanjeev Raut
Charlene Martin
Valerie Capers Workman

Report Date : 23-MAR-11

ITEMIZED STATEMENT

As of Date (DD-MMM-YYYY): 23-MAR-2011
Customer No : 26455-77316-01-RAM
Category Set :
Category Group :
Group No :
Bankruptcy : No Bankruptcy Sites
Disputed : No
Finance Charges Included: Yes

Page 1 of 11

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-C1-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2009 | 41094533 | 31-AUG-09 | Actual-1000A-RO | | 1699.82 | 0.00 | 432.84 | 2132.66 |
| | 41094196 | 31-AUG-09 | Actual-1230A-RI | | 1989.31 | 0.00 | 512.21 | 2501.52 |
| | | | Sub Total | | 3689.13 | 0.00 | 945.05 | 4634.18 |
| SEP-2009 | 30341163 | 10-SEP-09 | 2010 RMA DUES | | 3000.00 | 0.00 | 589.50 | 3589.50 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 25037760 | 22-SEP-09 | WYNREWARDS 5% | 182.63 | 0.00 | 44.20 | 226.83 |
| | 1034286 | 22-SEP-09 | GDS & INTERNET | 198.35 | 0.00 | 47.99 | 246.34 |
| | 10405312 | 24-SEP-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 14.52 | 74.52 |
| | 41109810 | 30-SEP-09 | 5066A-DIRECWAY | 150.00 | 9.38 | 38.56 | 197.94 |
| | 41129014 | 30-SEP-09 | Actual-1230A-RI | 1844.91 | 0.00 | 446.49 | 2291.40 |
| | 41127445 | 30-SEP-09 | Actual-1000A-RO | 1639.92 | 0.00 | 396.88 | 2036.80 |
| | | | Sub Total | 7075.81 | 9.38 | 1578.14 | 8663.33 |
| OCT-2009 | 10410973 | 01-OCT-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 14.52 | 74.52 |
| | 10413101 | 08-OCT-09 | GUEST SRVCS TRA | 100.00 | 0.00 | 24.20 | 124.20 |
| | 10413100 | 08-OCT-09 | GUEST SATISFACT | 57.00 | 0.00 | 13.79 | 70.79 |
| | 10414523 | 15-OCT-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 14.52 | 74.52 |
| | 25038936 | 22-OCT-09 | WYNREWARDS 5% | 107.23 | 0.00 | 24.33 | 131.56 |
| | 1040298 | 26-OCT-09 | GDS & INTERNET | 222.80 | 0.00 | 50.54 | 273.34 |
| | TA0040298 | 26-OCT-09 | T/A COMMISSIONS | (98.20) | 0.00 | 0.00 | (98.20) |
| | 41162220 | 31-OCT-09 | Actual-1230A-RI | 2274.07 | 0.00 | 516.23 | 2790.30 |
| | 41163356 | 31-OCT-09 | Actual-1000A-RO | 2021.40 | 0.00 | 458.84 | 2480.24 |
| | 41148904 | 31-OCT-09 | 5066A-DIRECWAY | 150.00 | 9.38 | 36.17 | 195.55 |
| | | | Sub Total | 4954.30 | 9.38 | 1153.14 | 6116.82 |
| NOV-2009 | 10426564 | 11-NOV-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 13.62 | 73.62 |
| | 30354048 | 12-NOV-09 | CRS REACTIVATIO | 200.00 | 0.00 | 45.40 | 245.40 |
| | 10429204 | 19-NOV-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 12.69 | 72.69 |
| | 10428959 | 19-NOV-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 12.69 | 72.69 |
| | 10429380 | 19-NOV-09 | GUEST SRVCS PRO | 60.00 | 0.00 | 12.69 | 72.69 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 10428918 | 19-NOV-09 | GUEST SRVCS PRO | | 60.00 | 0.00 | 12.69 | 72.69 |
| | 10429054 | 19-NOV-09 | GUEST SRVCS PRO | | 60.00 | 0.00 | 12.69 | 72.69 |
| | 25039637 | 22-NOV-09 | WYNREWARDS 5% | | 466.34 | 0.00 | 98.67 | 565.01 |
| | 1047716 | 22-NOV-09 | GDS & INTERNET | | 246.90 | 0.00 | 52.23 | 299.13 |
| | 30358089 | 25-NOV-09 | G.Patel | | 250.00 | 0.00 | 52.91 | 302.91 |
| | 30358088 | 25-NOV-09 | G.Patel | | 800.00 | 0.00 | 169.20 | 969.20 |
| | 30358087 | 25-NOV-09 | A.Patel | | 1250.00 | 0.00 | 264.41 | 1514.41 |
| | 10430862 | 25-NOV-09 | GUEST SRVCS PRO | | 60.00 | 0.00 | 12.69 | 72.69 |
| | 41198428 | 30-NOV-09 | Actual-1230A-RI | | 2049.66 | 0.00 | 477.28 | 2526.94 |
| | 41186678 | 30-NOV-09 | 5066A-DIRECWAY | | 150.00 | 9.38 | 33.70 | 193.08 |
| | 41198906 | 30-NOV-09 | Actual-1000A-RO | | 1821.92 | 0.00 | 424.27 | 2246.19 |
| | | | Sub Total | | 7654.82 | 9.38 | 1707.83 | 9372.03 |
| DEC-2009 | 10433549 | 02-DEC-09 | GUEST SRVCS TRA | | 100.00 | 0.00 | 21.15 | 121.15 |
| | 10433551 | 02-DEC-09 | GUEST SATISFACT | | 56.11 | 0.00 | 11.87 | 67.98 |
| | 30373872 | 09-DEC-09 | Q/A REINSPECTIO | | 1500.00 | 0.00 | 317.25 | 1817.25 |
| | 25040634 | 22-DEC-09 | WYNREWARDS 5% | | 126.58 | 0.00 | 24.80 | 151.38 |
| | 1103869 | 24-DEC-09 | GDS & INTERNET | | 157.55 | 0.00 | 30.86 | 188.41 |
| | 30382269 | 31-DEC-09 | DEC-09 PRORATE | | 154.84 | 9.68 | 32.25 | 196.77 |
| | 41228413 | 31-DEC-09 | Actual-1000A-RO | | 751.23 | 0.00 | 147.22 | 898.45 |
| | 41228774 | 31-DEC-09 | Actual-1230A-RI | | 845.13 | 0.00 | 165.66 | 1010.79 |
| | 30381620 | 31-DEC-09 | REMEDIAL TRAINI | | 250.00 | 15.63 | 52.07 | 317.70 |
| | | | Sub Total | | 3941.44 | 25.31 | 803.13 | 4769.88 |
| JAN-2010 | TA0110303 | 29-JAN-10 | T/A COMMISSIONS | | 24.00 | 0.00 | 4.36 | 28.36 |
| | 1110303 | 29-JAN-10 | GDS & INTERNET | | 63.90 | 0.00 | 11.63 | 75.53 |
| | TC0110303 | 29-JAN-10 | T/A COMM SERVIC | | 2.12 | 0.00 | 0.36 | 2.48 |
| | TM0110303 | 29-JAN-10 | MEMBER BENEFIT | | 18.40 | 0.00 | 3.40 | 21.80 |
| | 41246639 | 31-JAN-10 | 5715A-HughesNet | | 160.00 | 10.00 | 30.97 | 200.97 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct, Chattanooga, TN, 37421, US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total | 268.42 | 10.00 | 50.72 | 329.14 |
| FEB-2010 | 25042498 | 22-FEB-10 | WYNREWARDS 5% | | 15.10 | 0.00 | 2.50 | 17.60 |
| | 41280137 | 28-FEB-10 | 5715A-HughesNet | | 160.00 | 10.00 | 28.34 | 198.34 |
| | 41297150 | 28-FEB-10 | Actual-1000A-RO | | 1093.10 | 0.00 | 70.01 | 1163.11 |
| | 41298676 | 28-FEB-10 | Actual-1230A-RI | | 1229.74 | 0.00 | 78.82 | 1308.56 |
| | | | | Sub Total | 2497.94 | 10.00 | 179.67 | 2687.61 |
| MAR-2010 | TCO116778 | 03-MAR-10 | T/A COMM SERVIC | | 60.18 | 0.00 | 9.99 | 70.17 |
| | 1116778 | 03-MAR-10 | GDS & INTERNET | | 15.05 | 0.00 | 2.50 | 17.55 |
| | TA0116778 | 03-MAR-10 | T/A COMMISSIONS | | 1203.51 | 0.00 | 200.35 | 1403.86 |
| | 30412688 | 12-MAR-10 | '10 GLOBAL CONF | | 999.00 | 0.00 | 151.84 | 1150.84 |
| | 25043387 | 22-MAR-10 | WYNREWARDS 5% | | 57.53 | 0.00 | 8.70 | 66.23 |
| | 1122865 | 29-MAR-10 | GDS & INTERNET | | 119.10 | 0.00 | 18.08 | 137.18 |
| | TM0122865 | 29-MAR-10 | MEMBER BENEFIT | | 9.60 | 0.00 | 1.44 | 11.04 |
| | TA0122865 | 29-MAR-10 | T/A COMMISSIONS | | (17.53) | 0.00 | 0.00 | (17.53) |
| | TR0122865 | 29-MAR-10 | TMC / CONSORTIA | | 7.50 | 0.00 | 1.15 | 8.65 |
| | 41316079 | 31-MAR-10 | 5715A-HughesNet | | 160.00 | 10.00 | 25.78 | 195.78 |
| | 41331838 | 31-MAR-10 | Actual-1000A-RO | | 3225.88 | 0.00 | 262.79 | 3488.67 |
| | 41332506 | 31-MAR-10 | Actual-1230A-RI | | 3629.12 | 0.00 | 295.62 | 3924.74 |
| | | | | Sub Total | 9468.94 | 10.00 | 978.24 | 10457.18 |
| APR-2010 | 30423988 | 09-APR-10 | CRS REACTIVATIO | | 200.00 | 0.00 | 30.30 | 230.30 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 30429308 | 14-APR-10 | ONLINE LRNG LIB | 50.00 | 0.00 | 7.60 | 57.60 |
| 10455685 | 15-APR-10 | GUEST SRVCS PRO | 60.00 | 0.00 | 9.09 | 69.09 |
| 10455593 | 15-APR-10 | GUEST SRVCS PRO | 60.00 | 0.00 | 9.09 | 69.09 |
| TA0129747 | 18-APR-10 | T/A COMMISSIONS | 46.17 | 0.00 | 6.30 | 52.47 |
| TM0129747 | 18-APR-10 | MEMBER BENEFIT | 37.60 | 0.00 | 5.10 | 42.70 |
| TG0129747 | 18-APR-10 | GSA FEES | 16.20 | 0.00 | 2.19 | 18.39 |
| TC0129747 | 18-APR-10 | T/A COMM SERVIC | 4.30 | 0.00 | 0.59 | 4.89 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Amount Billing | Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 1129747 | 18-APR-10 | GDS & INTERNET | | 129.15 | 0.00 | 17.56 | 146.71 |
| | 25044069 | 22-APR-10 | WYNREWARDS 5% | | 63.90 | 0.00 | 8.69 | 72.59 |
| | 10459491 | 29-APR-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 13.60 | 113.60 |
| | 10459492 | 29-APR-10 | GUEST SATISFACT | | 25.00 | 0.00 | 3.42 | 28.42 |
| | 41368556 | 30-APR-10 | Actual-1230A-RI | | 2664.00 | 0.00 | 187.86 | 2851.86 |
| | 41350041 | 30-APR-10 | 5715A-HughesNet | | 160.00 | 10.00 | 23.15 | 193.15 |
| | 41367064 | 30-APR-10 | Actual-1000A-RO | | 2368.00 | 0.00 | 166.99 | 2534.99 |
| | | | Sub Total | | 5984.32 | 10.00 | 491.53 | 6485.85 |
| MAY-2010 | 10459898 | 06-MAY-10 | GUEST SRVCS PRO | | 60.00 | 0.00 | 8.16 | 68.16 |
| | 10460366 | 06-MAY-10 | GUEST SATISFACT | | 75.00 | 0.00 | 10.20 | 85.20 |
| | 10460367 | 06-MAY-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 13.60 | 113.60 |
| | 30436120 | 11-MAY-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 231.20 | 1931.20 |
| | 10462878 | 20-MAY-10 | GUEST SATISFACT | | 50.01 | 0.00 | 6.07 | 56.08 |
| | 10462879 | 20-MAY-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 12.10 | 112.10 |
| | 25045376 | 22-MAY-10 | WYNREWARDS 5% | | 16.70 | 0.00 | 2.02 | 18.72 |
| | TA0136303 | 23-MAY-10 | T/A COMMISSIONS | | 38.77 | 0.00 | 4.68 | 43.45 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | TR0136303 | 23-MAY-10 | TMC / CONSORTIA | 17.99 | 0.00 | 2.18 | 20.17 |
| | TM0136303 | 23-MAY-10 | MEMBER BENEFIT | 35.99 | 0.00 | 4.36 | 40.35 |
| | 1136303 | 23-MAY-10 | GDS & INTERNET | 215.70 | 0.00 | 26.10 | 241.80 |
| | TC0136303 | 23-MAY-10 | T/A COMM SERVIC | 6.55 | 0.00 | 0.79 | 7.34 |
| | 41400885 | 31-MAY-10 | Actual-1000A-RO | 4083.92 | 0.00 | 360.72 | 4444.64 |
| | 41384957 | 31-MAY-10 | 5715A-HughesNet | 160.00 | 10.00 | 20.59 | 190.59 |
| | 41402582 | 31-MAY-10 | Actual-1230A-RI | 4594.41 | 0.00 | 405.83 | 5000.24 |
| | | | Sub Total | 11255.04 | 10.00 | 1108.60 | 12373.64 |
| JUN-2010 | TC0142341 | 20-JUN-10 | T/A COMM SERVIC | 20.24 | 0.00 | 2.11 | 22.35 |
| | TM0142341 | 20-JUN-10 | MEMBER BENEFIT | 62.80 | 0.00 | 6.61 | 69.41 |
| | TR0142341 | 20-JUN-10 | TMC / CONSORTIA | 29.89 | 0.00 | 3.15 | 33.04 |
| | TA0142341 | 20-JUN-10 | T/A COMMISSIONS | 204.05 | 0.00 | 21.52 | 225.57 |
| | 1142341 | 20-JUN-10 | GDS & INTERNET | 587.20 | 0.00 | 61.95 | 649.15 |
| | 25046241 | 22-JUN-10 | WYNREWARDS 5% | 37.30 | 0.00 | 3.94 | 41.24 |
| | 41419034 | 30-JUN-10 | 5715A-HughesNet | 160.00 | 10.00 | 17.95 | 187.95 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|
| | 41435411 | 30-JUN-10 | Actual-1230A-RI | 4372.43 | 0.00 | 265.76 | 4638.19 |
| | 41435439 | 30-JUN-10 | Actual-1000A-RO | 3886.60 | 0.00 | 236.24 | 4122.84 |
| | | | Sub Total | 9360.51 | 10.00 | 619.23 | 9989.74 |
| JUL-2010 | 10471231 | 01-JUL-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 16.88 | 176.88 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 10471137 | 01-JUL-10 | GUEST SATISFACT | 31.43 | 0.00 | 3.32 | 34.75 |
| | 30465018 | 15-JUL-10 | Q/A REINSPECTIO | 1700.00 | 0.00 | 179.35 | 1879.35 |
| | 10475243 | 15-JUL-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 16.88 | 176.88 |
| | 10475242 | 15-JUL-10 | GUEST SATISFACT | 50.00 | 0.00 | 5.29 | 55.29 |
| | 1149741 | 18-JUL-10 | GDS & INTERNET | 745.55 | 0.00 | 67.11 | 812.66 |
| | TC0149741 | 18-JUL-10 | T/A COMM SERVIC | 24.05 | 0.00 | 2.16 | 26.21 |
| | TG0149741 | 18-JUL-10 | GSA FEES | 23.27 | 0.00 | 2.10 | 25.37 |
| | TM0149741 | 18-JUL-10 | MEMBER BENEFIT | 98.48 | 0.00 | 8.88 | 107.36 |
| | TR0149741 | 18-JUL-10 | TMC / CONSORTIA | 49.04 | 0.00 | 4.42 | 53.46 |
| | TA0149741 | 18-JUL-10 | T/A COMMISSIONS | 222.53 | 0.00 | 20.04 | 242.57 |
| | 10477067 | 22-JUL-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 14.40 | 174.40 |
| | 10477069 | 22-JUL-10 | GUEST SATISFACT | 25.00 | 0.00 | 2.26 | 27.26 |
| | 25047374 | 22-JUL-10 | WYNREWARDS 5% | 3.16 | 0.00 | 0.29 | 3.45 |
| | 41468998 | 31-JUL-10 | Actual-1230A-RI | 6128.55 | 0.00 | 304.94 | 6433.49 |
| | 41468184 | 31-JUL-10 | Actual-1000A-RO | 5447.60 | 0.00 | 271.07 | 5718.67 |
| | 41452062 | 31-JUL-10 | 5715A-HughesNet | 160.00 | 10.00 | 15.32 | 185.32 |
| | | | Sub Total | 15188.66 | 10.00 | 934.71 | 16133.37 |
| AUG-2010 | 10482414 | 05-AUG-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 14.40 | 174.40 |
| | 10482413 | 05-AUG-10 | GUEST SATISFACT | 78.56 | 0.00 | 7.08 | 85.64 |
| | 10482946 | 05-AUG-10 | GUEST SATISFACT | 40.00 | 0.00 | 3.60 | 43.60 |
| | 10482947 | 05-AUG-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 14.40 | 174.40 |
| | 25048109 | 22-AUG-10 | WYNREWARDS 5% | 67.29 | 0.00 | 5.04 | 72.33 |
| | TM0156364 | 22-AUG-10 | MEMBER BENEFIT | 47.36 | 0.00 | 3.54 | 50.90 |
| | TA0156364 | 22-AUG-10 | T/A COMMISSIONS | 415.90 | 0.00 | 31.20 | 447.10 |
| | TC0156364 | 22-AUG-10 | T/A COMM SERVIC | 35.44 | 0.00 | 2.66 | 38.10 |
| | 1156364 | 22-AUG-10 | GDS & INTERNET | 648.40 | 0.00 | 48.64 | 697.04 |
| | TR0156364 | 22-AUG-10 | TMC / CONSORTIA | 189.77 | 0.00 | 14.24 | 204.01 |

Page 6 of 11

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 41500087 | 31-AUG-10 | Actual-1230A-RI | | 7161.80 | 0.00 | 280.75 | 7442.55 |
| | 41501183 | 31-AUG-10 | Actual-1000A-RO | | 6366.04 | 0.00 | 249.56 | 6615.60 |
| | 41484729 | 31-AUG-10 | 5715A-HughesNet | | 160.00 | 10.00 | 12.76 | 182.76 |
| | | | Sub Total | | 15530.56 | 10.00 | 687.87 | 16228.43 |
| SEP-2010 | 10493591 | 02-SEP-10 | GUEST SATISFACT | | 175.00 | 0.00 | 13.13 | 188.13 |
| | 10493589 | 02-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 12.00 | 172.00 |
| | 30485416 | 10-SEP-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 127.50 | 1827.50 |
| | 10497637 | 16-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 12.00 | 172.00 |
| | 10497704 | 16-SEP-10 | GUEST SATISFACT | | 40.00 | 0.00 | 3.00 | 43.00 |
| | TR0163062 | 19-SEP-10 | TMC / CONSORTIA | | 60.10 | 0.00 | 3.57 | 63.67 |
| | TG0163062 | 19-SEP-10 | GSA FEES | | 6.67 | 0.00 | 0.39 | 7.06 |
| | TM0163062 | 19-SEP-10 | MEMBER BENEFIT | | 100.00 | 0.00 | 5.95 | 105.95 |
| | TA0163062 | 19-SEP-10 | T/A COMMISSIONS | | 173.94 | 0.00 | 10.36 | 184.30 |
| | TC0163062 | 19-SEP-10 | T/A COMM SERVIC | | 21.19 | 0.00 | 1.27 | 22.46 |
| | 1163062 | 19-SEP-10 | GDS & INTERNET | | 414.40 | 0.00 | 24.65 | 439.05 |
| | 25048413 | 22-SEP-10 | WYNREWARDS 5% | | 87.06 | 0.00 | 5.18 | 92.24 |
| | 10499143 | 23-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 10498140 | 23-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 10499142 | 23-SEP-10 | GUEST SATISFACT | | 77.45 | 0.00 | 4.60 | 82.05 |
| | 10498194 | 23-SEP-10 | GUEST SATISFACT | | 88.68 | 0.00 | 5.27 | 93.95 |
| | 10500137 | 30-SEP-10 | GUEST SATISFACT | | 50.00 | 0.00 | 2.99 | 52.99 |
| | 10500138 | 30-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 10500340 | 30-SEP-10 | GUEST SATISFACT | | 40.00 | 0.00 | 2.38 | 42.38 |
| | 41533475 | 30-SEP-10 | Actual-1230A-RI | | 3729.24 | 0.00 | 158.26 | 3887.50 |
| | 41517435 | 30-SEP-10 | 5715A-HughesNet | | 160.00 | 10.00 | 10.13 | 180.13 |
| | 10500341 | 30-SEP-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 41533186 | 30-SEP-10 | Actual-1000A-RO | | 3314.88 | 0.00 | 140.68 | 3455.56 |
| | | | Sub Total | | 11198.61 | 10.00 | 581.39 | 11790.00 |
| OCT-2010 | 10501798 | 07-OCT-10 | GUEST SATISFACT | | 50.00 | 0.00 | 2.99 | 52.99 |
| | 10501730 | 07-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 30497037 | 08-OCT-10 | 2011 Ramada RMA | | 3000.00 | 0.00 | 42.00 | 3042.00 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct, Chattanooga, TN, 37421, US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | 10503761 | 14-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 10503540 | 14-OCT-10 | GUEST SATISFACT | | 25.00 | 0.00 | 1.49 | 26.49 |
| | 10503541 | 14-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 10503066 | 14-OCT-10 | GUEST SATISFACT | | 72.96 | 0.00 | 4.34 | 77.30 |
| | 10504028 | 14-OCT-10 | GUEST SATISFACT | | 25.00 | 0.00 | 1.49 | 26.49 |
| | 10503064 | 14-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | 10503763 | 14-OCT-10 | GUEST SATISFACT | | 25.00 | 0.00 | 1.49 | 26.49 |
| | 10504029 | 14-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 9.52 | 169.52 |
| | TR0169735 | 17-OCT-10 | TMC / CONSORTIA | | 9.78 | 0.00 | 0.44 | 10.22 |
| | TA0169735 | 17-OCT-10 | T/A COMMISSIONS | | 111.70 | 0.00 | 4.97 | 116.67 |
| | TM0169735 | 17-OCT-10 | MEMBER BENEFIT | | 45.36 | 0.00 | 2.02 | 47.38 |
| | TC0169735 | 17-OCT-10 | T/A COMM SERVIC | | 12.59 | 0.00 | 0.57 | 13.16 |
| | I169735 | 17-OCT-10 | GDS & INTERNET | | 263.80 | 0.00 | 11.74 | 275.54 |
| | 10505088 | 21-OCT-10 | GUEST SATISFACT | | 61.74 | 0.00 | 2.75 | 64.49 |
| | 10505682 | 21-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 7.12 | 167.12 |
| | 10505684 | 21-OCT-10 | GUEST SATISFACT | | 61.74 | 0.00 | 2.75 | 64.49 |
| | 10505086 | 21-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 7.12 | 167.12 |
| | 25049900 | 22-OCT-10 | WYNREWARDS 5% | | 70.19 | 0.00 | 3.12 | 73.31 |
| | 30500548 | 26-OCT-10 | AUDIT CANCEL FE | | 500.00 | 0.00 | 22.25 | 522.25 |
| | 10506229 | 28-OCT-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 7.12 | 167.12 |
| | 10506228 | 28-OCT-10 | GUEST SATISFACT | | 52.96 | 0.00 | 2.35 | 55.31 |
| | 41567053 | 31-OCT-10 | Actual-1230A-RI | | 3343.59 | 0.00 | 118.39 | 3461.98 |
| | 41550174 | 31-OCT-10 | 5715A-HughesNet | | 160.00 | 10.00 | 7.57 | 177.57 |
| | 41565923 | 31-OCT-10 | Actual-1000A-RO | | 2972.08 | 0.00 | 105.24 | 3077.32 |
| | | | Sub Total | | 12143.49 | 10.00 | 406.92 | 12560.41 |
| NOV-2010 | 10509220 | 10-NOV-10 | GUEST SATISFACT | | 50.00 | 0.00 | 2.23 | 52.23 |
| | 10509218 | 10-NOV-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 7.12 | 167.12 |
| | 10510687 | 17-NOV-10 | GUEST SRVCS TRA | | 160.00 | 0.00 | 4.64 | 164.64 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10510660 | 17-NOV-10 | GUEST SATISFACT | 89.90 | 0.00 | 2.61 | 92.51 |
| 10510894 | 17-NOV-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 4.64 | 164.64 |
| 10510893 | 17-NOV-10 | GUEST SATISFACT | 45.00 | 0.00 | 1.31 | 46.31 |
| TC0176250 | 21-NOV-10 | T/A COMM SERVIC | 44.73 | 0.00 | 1.30 | 46.03 |
| 1176250 | 21-NOV-10 | GDS & INTERNET | 496.40 | 0.00 | 14.40 | 510.80 |
| TM0176250 | 21-NOV-10 | MEMBER BENEFIT | 96.08 | 0.00 | 2.79 | 98.87 |
| TR0176250 | 21-NOV-10 | TMC / CONSORTIA | 73.13 | 0.00 | 2.12 | 75.25 |

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|
| | TA0176250 | 21-NOV-10 | T/A COMMISSIONS | 493.24 | 0.00 | 14.31 | 507.55 |
| | 25050385 | 22-NOV-10 | WYNREWARDS 5% | 63.77 | 0.00 | 1.85 | 65.62 |
| | 10512897 | 24-NOV-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 4.64 | 164.64 |
| | 10512896 | 24-NOV-10 | GUEST SATISFACT | 50.00 | 0.00 | 1.45 | 51.45 |
| | 41582745 | 30-NOV-10 | 5715A-HughesNet | 160.00 | 10.00 | 4.93 | 174.93 |
| | 41598777 | 30-NOV-10 | Actual-1000A-RO | 2866.76 | 0.00 | 60.00 | 2926.76 |
| | 41598929 | 30-NOV-10 | Actual-1230A-RI | 3225.11 | 0.00 | 67.51 | 3292.62 |
| | | | Sub Total | 8394.12 | 10.00 | 197.85 | 8601.97 |
| DEC-2010 | TA0182949 | 20-DEC-10 | T/A COMMISSIONS | 169.08 | 0.00 | 2.28 | 171.36 |
| | TR0182949 | 20-DEC-10 | TMC / CONSORTIA | 24.26 | 0.00 | 0.33 | 24.59 |
| | 1182949 | 20-DEC-10 | GDS & INTERNET | 180.00 | 0.00 | 2.43 | 182.43 |
| | TC0182949 | 20-DEC-10 | T/A COMM SERVIC | 21.64 | 0.00 | 0.29 | 21.93 |
| | TM0182949 | 20-DEC-10 | MEMBER BENEFIT | 103.44 | 0.00 | 1.40 | 104.84 |
| | 25051341 | 22-DEC-10 | WYNREWARDS 5% | 156.74 | 0.00 | 2.12 | 158.86 |
| | 10516190 | 22-DEC-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 2.16 | 162.16 |
| | 10516244 | 22-DEC-10 | GUEST SATISFACT | 75.00 | 0.00 | 1.01 | 76.01 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 10517080 | 29-DEC-10 | GUEST SATISFACT | 56.13 | 0.00 | 0.76 | 56.89 |
| | 10517301 | 29-DEC-10 | GUEST SATISFACT | 56.42 | 0.00 | 0.76 | 57.18 |
| | 10517273 | 29-DEC-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 2.16 | 162.16 |
| | 10517081 | 29-DEC-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 2.16 | 162.16 |
| | 41615394 | 31-DEC-10 | 5715A-HughesNet | 160.00 | 10.00 | 2.30 | 172.30 |
| | 41630886 | 31-DEC-10 | Actual-1000A-RO | 2433.12 | 0.00 | 32.85 | 2465.97 |
| | 41631608 | 31-DEC-10 | Actual-1230A-RI | 2737.26 | 0.00 | 36.95 | 2774.21 |
| | | | Sub Total | 6653.09 | 10.00 | 89.96 | 6753.05 |
| JAN-2011 | 10517905 | 05-JAN-11 | GUEST SRVCS TRA | 160.00 | 0.00 | 2.16 | 162.16 |
| | 10517907 | 05-JAN-11 | GUEST SATISFACT | 30.00 | 0.00 | 0.41 | 30.41 |
| | 30524633 | 11-JAN-11 | Q/A REINSPECTIO | 1700.00 | 0.00 | 22.95 | 1722.95 |
| | TC0189463 | 16-JAN-11 | T/A COMM SERVIC | 11.57 | 0.00 | 0.16 | 11.73 |
| | 1189463 | 16-JAN-11 | GDS & INTERNET | 109.20 | 0.00 | 1.53 | 110.73 |
| | TR0189463 | 16-JAN-11 | TMC / CONSORTIA | 12.36 | 0.00 | 0.17 | 12.53 |
| | TA0189463 | 16-JAN-11 | T/A COMMISSIONS | 36.88 | 0.00 | 0.52 | 37.40 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | TM0189463 | 16-JAN-11 | MEMBER BENEFIT | | 110.56 | 0.00 | 1.55 | 112.11 |
| | 25051831 | 22-JAN-11 | WYNREWARDS 5% | | 142.61 | 0.00 | 1.57 | 144.18 |
| | 30530037 | 28-JAN-11 | AUDIT CANCEL FE | | 500.00 | 0.00 | 4.00 | 504.00 |
| | 41663927 | 31-JAN-11 | Actual-1000A-RO | | 1821.96 | 0.00 | 11.84 | 1833.80 |
| | 41665293 | 31-JAN-11 | Actual-1230A-RI | | 2049.70 | 0.00 | 13.32 | 2063.02 |
| | 30550263 | 31-JAN-11 | HughesNet VSAT | | 160.00 | 10.00 | 1.11 | 171.11 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Sub Total | 6844.84 | 10.00 | 61.29 | 6916.13 |
| FEB-2011 | 10521920 | 02-FEB-11 | GUEST SATISFACT | 55.00 | 0.00 | 0.30 | 55.30 |
| | 10521918 | 02-FEB-11 | GUEST SRVCS TRA | 160.00 | 0.00 | 0.88 | 160.88 |
| | 10524209 | 16-FEB-11 | GUEST SRVCS TRA | 160.00 | 0.00 | 0.00 | 160.00 |
| | 10524208 | 16-FEB-11 | GUEST SATISFACT | 50.00 | 0.00 | 0.00 | 50.00 |
| | 30543740 | 18-FEB-11 | AUDIT CANCEL FE | 500.00 | 0.00 | 0.00 | 500.00 |
| | TR0195910 | 20-FEB-11 | TMC / CONSORTIA | 32.74 | 0.00 | 0.00 | 32.74 |
| | TC0195910 | 20-FEB-11 | T/A COMM SERVIC | 9.89 | 0.00 | 0.00 | 9.89 |
| | TA0195910 | 20-FEB-11 | T/A COMMISSIONS | 88.82 | 0.00 | 0.00 | 88.82 |
| | TM0195910 | 20-FEB-11 | MEMBER BENEFIT | 42.56 | 0.00 | 0.00 | 42.56 |
| | 1195910 | 20-FEB-11 | GDS & INTERNET | 183.20 | 0.00 | 0.00 | 183.20 |
| | 25052955 | 22-FEB-11 | WYNREWARDS 5% | 97.08 | 0.00 | 0.00 | 97.08 |
| | 10524941 | 24-FEB-11 | GUEST SATISFACT | 99.00 | 0.00 | 0.00 | 99.00 |
| | 10524942 | 24-FEB-11 | GUEST SRVCS TRA | 160.00 | 0.00 | 0.00 | 160.00 |
| | 41697353 | 28-FEB-11 | Actual-1230A-RI | 2451.78 | 0.00 | 0.00 | 2451.78 |
| | 30547577 | 28-FEB-11 | STAR REPORT RER | 75.00 | 0.00 | 0.00 | 75.00 |
| | 41681312 | 28-FEB-11 | 5715A-HughesNet | 160.00 | 10.00 | 0.00 | 170.00 |
| | 41696822 | 28-FEB-11 | Actual-1000A-RO | 2179.36 | 0.00 | 0.00 | 2179.36 |
| | | | Sub Total | 6504.43 | 10.00 | 1.18 | 6515.61 |
| MAR-2011 | 10528763 | 17-MAR-11 | GUEST SRVCS TRA | 160.00 | 0.00 | 0.00 | 160.00 |
| | 10528708 | 17-MAR-11 | GUEST SATISFACT | 50.00 | 0.00 | 0.00 | 50.00 |

Report Date : 23-MAR-11

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 23-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | Sub Total | | 210.00 | 0.00 | 0.00 | 210.00 |
| | | | Grand Total | | 148818.47 | 193.45 | 12576.45 | 161588.37 |

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

## Shipment Receipt

Transaction Date: 25 Mar 2011
Tracking Number: 1Z22445X0297432768

### 1 Address Information

**Ship To:**
Inn At The Wickliffe, Llc
Ghanshyam Patel
Ramada
28600 Ridgehill Drive
WICKLIFFE OH 440922788
Telephone:(423) 892-1059

**Ship From:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236

### 2 Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1 | Letter | UPS Letter | | Reference # 1 - 006-5072 |

### 3 UPS Shipping Service and Shipping Options

Service:
UPS 2nd Day Air

Guaranteed By: [1]
End of Day Tuesday, 3/29/2011

| Shipping Fees Subtotal: | 12.43 USD |
|---|---|
| Transportation | 11.20 USD |
| Fuel Surcharge | 1.23 USD |

### 4 Payment Information

Bill Shipping Charges to: Shipper's Account 22445X

Daily rates were applied to this shipment

Total Charged: 12.43 USD

Note: Your invoice may vary from the displayed reference rates.

[1] For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

Close Window

# EXHIBIT I



Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445
www.wyndhamworldwide.com

February 14, 2013

**VIA OVERNIGHT DELIVERY**

Mr. Ghanshyam Patel
INN AT THE WICKLIFFE, LLC
28600 Ridgehill Road
Wickliffe, OH 44092

**Re: NOTICE OF QUALITY ASSURANCE DEFAULT relating to Ramada® Unit #26455-77316-1 located in Wickliffe, OH (the "Facility")**

Dear Mr. Patel:

I write on behalf of RAMADA WORLDWIDE INC. ("we," "us," or "our") regarding the License Agreement (the "Agreement") dated June 27, 2008, between INN AT THE WICKLIFFE, LLC ("you" or "your") and us. We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to maintain the Facility according to System Standards. Our Quality Assurance Consultant conducted an inspection of the Facility on February 12, 2013. The Facility received a failing score of 51.8%-F. We will re-inspect the Facility after at least thirty (30) days from the date of this Notice. If the Facility does not receive a passing quality assurance score at this re-inspection, the Agreement may be subject to termination. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system. By copy of this letter, we are also informing your guarantor of your default.

Please be advised that a copy of the QA Evaluation report has been provided to you at the time of the inspection.



      

        

We hope you will take this opportunity to resolve your quality assurance default. If you have any questions regarding your default or how it can be timely cured, please contact Operations Support Desk at (800) 221-7312.

Sincerely yours,

Suzanne Fenimore
Senior Director
Contracts Compliance, Legal

cc:     Meeta Sheth (Guarantor)
        Mark Young
        Tracy Ripa

# **EXHIBIT J**



WYNDHAM
HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445
www.wyndhamworldwide.com

July 10, 2013

**VIA 2 DAY DELIVERY METHOD**

Mr. Ghanshyam Patel
Inn at the Wickliffe, LLC
28600 Ridgehill Drive
Wickliffe, OH 44092

Re: **NOTICE OF TERMINATION** of Franchise Agreement, dated June 27, 2008, (the "Agreement") between Inn at the Wickliffe, LLC, ("you" or "your") and Ramada Worldwide Inc., ("we", "our" or "us") for the Ramada® System Unit #26455-77316-01 located in Wickliffe, OH (the "Facility")

Dear Mr. Patel:

We write to give you formal notice of the termination of the Franchise granted under the Agreement to operate the Facility as part of the Ramada System (the "Notice"). This termination is a result of your failure to cure your default under the Agreement, due to your failure to satisfy the required Quality Standards. The termination of your Agreement is effective as of the date of this Notice (the "Termination Date").

Because the Agreement is terminated, you must perform your post-termination obligations such as the removal of all items that display or refer to the Ramada brand at the Facility. The de-identification procedures are specified in the attachment to this Notice. These de-identification procedures must be completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of the date of this Notice, you owe us $15,595.60 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $213,000.00 as specified in Section 18.4 of the Agreement.

Please know that, because the Agreement is terminated, you also have lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination you will have limited functionality from the system. Should you wish to continue using an independent version of the software and be interested in a minimum continuation agreement of 24 months, please contact Sabre at 877-520-3646, an authorized reseller of the WynGuest product. If your property is planning to migrate to another property management system in less than 24 months, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Scott Robertson at 506-631-2104 to obtain reporting of that data.

       
       

Mr. Ghanshyam Patel
July 10, 2013
Page Two

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Ramada name and marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the date of this Notice.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantor.

If you have any questions regarding your obligations under this Notice, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753- 7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosure

cc:    Mecta Sheth (Guarantor)
       Mark Young
       Larry Geer
       Charlene Martin
       Joe Maida
       Mike Piccola

**DE-IDENTIFICATION PROCEDURES**

**You must complete each of the following within 10 days after the Termination Date:**

1. Remove, replace or cover with an opaque cover the primary Facility signage.

2. Remove all interior signage that contains Ramada Marks.

3. Change advertising billboards to remove Ramada Marks.

4. Stop answering Facility telephone as Ramada guest lodging facility.

5. Remove Ramada name and Marks from any domain name, advertising and brochures.

6. Return to us all confidential operations and training manuals.

7. Remove the Ramada name and Marks from the following items:

    Stationery, pads and pens
    Directories and brochures
    Business cards
    Folios and registration cards
    Do-not-disturb cards
    Comment cards
    Telephone plates
    Telephone dialing instructions
    TV channel ID plates
    Rate/law cards
    Door signage
    Soap/shampoo
    Key tags
    Credit card imprinter
    Laundry bags
    Name tags/uniforms
    Ice buckets/trays
    Ashtrays/matches
    Plaques
    Guest checks/receipts
    Menus

8. Paint over or remove any distinctive Ramada trade dress, paint schemes or architectural features.

9. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Ramada facility.

10. Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

Report Date : 10-JUL-13

ITEMIZED STATEMENT

As of Date (DD-MMM-YYYY): 10-JUL-2013
Customer No : 26455-77316-01-RAM
Category Set :
Category Group :
Group No :
Bankruptcy : No Bankruptcy Sites
Disputed : No
Finance Charges Included: Yes

Report Date : 10-JUL-13

ITEMIZED STATEMENT

Customer No : 26455-77316-01-RAM
Address : 6702 Heritage Business Ct,Chattanooga,TN,37421,US
As of Date: 10-JUL-2013

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| MAY-2013 | 10669602 | 02-MAY-13 | GUEST SATISFACT | | 40.00 | 0.00 | 0.28 | 40.28 |
| | 10669383 | 02-MAY-13 | GUEST SRVCS TRA | | 160.00 | 0.00 | 1.12 | 161.12 |
| | 42536095 | 31-MAY-13 | Actual-1230A-RI | | 2588.35 | 0.00 | 0.00 | 2588.35 |
| | 42536094 | 31-MAY-13 | Actual-1000A-RO | | 2300.76 | 0.00 | 0.00 | 2300.76 |
| | | | | Sub Total | 5089.11 | 0.00 | 1.40 | 5090.51 |
| JUN-2013 | 10676102 | 06-JUN-13 | GUEST SATISFACT | | 79.00 | 0.00 | 0.00 | 79.00 |
| | 10675214 | 06-JUN-13 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 10676915 | 13-JUN-13 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 10676861 | 13-JUN-13 | GUEST SATISFACT | | 69.33 | 0.00 | 0.00 | 69.33 |
| | 30802892 | 13-JUN-13 | ONLINE LRNG LIB | | 60.00 | 0.00 | 0.00 | 60.00 |
| | TM0384219 | 20-JUN-13 | MEMBER BENEFIT | | 34.52 | 0.00 | 0.00 | 34.52 |
| | 1384219 | 20-JUN-13 | GDS & INTERNET | | 166.40 | 0.00 | 0.00 | 166.40 |
| | TR0384219 | 20-JUN-13 | TMC / CONSORTIA | | 101.05 | 0.00 | 0.00 | 101.05 |
| | TA0384219 | 20-JUN-13 | T/A COMMISSIONS | | 233.37 | 0.00 | 0.00 | 233.37 |
| | TC0384219 | 20-JUN-13 | T/A COMM SERVIC | | 20.09 | 0.00 | 0.00 | 20.09 |
| | 25078929 | 22-JUN-13 | WYNREWARDS CRDT | | (70.00) | 0.00 | 0.00 | (70.00) |
| | 25078867 | 22-JUN-13 | WYNREWARDS 5% | | 808.44 | 0.00 | 0.00 | 808.44 |
| | 42564650 | 30-JUN-13 | Accrual-1000A-R | * | 3872.44 | 0.00 | 0.00 | 3872.44 |
| | 42564651 | 30-JUN-13 | Accrual-1230A-R | * | 4356.50 | 0.00 | 0.00 | 4356.50 |
| | 30809654 | 30-JUN-13 | unprocessed GDS | | 283.15 | 0.00 | 0.00 | 283.15 |
| | 42551987 | 30-JUN-13 | 5715A-HughesNet | | 160.00 | 10.80 | 0.00 | 170.80 |
| | | | | Sub Total | 10494.29 | 10.80 | 0.00 | 10505.09 |
| | | | | Grand Total | 15583.40 | 10.80 | 1.40 | 15595.60 |

Requested By: Nicole Hassaballa

Report Date : 10-JUL-13

ITEMIZED STATEMENT

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

## Shipment Receipt

**Transaction Date**: 28 Jun 2013 **Tracking Number:** 1Z22445X0295677052

### 1 Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Inn at the Wickliffe<br>Ghanshyam Patel<br>28600 Ridgehill Drive<br>WICKLIFFE OH 440922788 | Wyndham Hotel Group - 22 Sylvan<br>Nicole Hassaballa<br>22 Sylvan Way<br>Parsippany NJ 07054<br>Telephone:973-753-8198 | Wyndham Hotel Group - 22 Sylvan<br>Nicole Hassaballa<br>22 Sylvan Way<br>Parsippany NJ 07054<br>Telephone:973-753-8198 |

### 2 Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter | UPS Letter | | Reference # 1 - 006-1696 |

### 3 UPS Shipping Service and Shipping Options

| | |
|---|---|
| **Service:** | UPS 2nd Day Air |
| **Guaranteed By:** | End of Day Tuesday, Jul 2, 2013 |
| **Shipping Fees Subtotal:** | **14.47 USD** |
| **Transportation** | 13.15 USD |
| **Fuel Surcharge** | 1.32 USD |

### 4 Payment Information

**Bill Shipping Charges to:** Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| **Total Charged:** | **14.47 USD** |
| **Negotiated Total:** | **5.62 USD** |

**Note: Your invoice may vary from the displayed reference rates.**
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT K



LECLAIRRYAN

May 18, 2015

***VIA CERTIFIED MAIL & REGULAR MAIL***

Inn at The Wickliffe, LLC
6702 Heritage Court
Chattanooga, Tennessee 37416

28600 Ridgehills Drive
Wickliffe, OH 44092

Meeta Sheth
1611 Ashley Mill Drive
Chattanooga, Tennessee 37421

Ghanshyam Patel
50 N. Woodside Lane
Williamsville, New York 14221

**Re: Demand to Cease and Desist Ongoing Infringement of Ramada Worldwide Inc.'s Trade Name and Service Marks at Facility located at 28600 Ridgehills Drive, Wickliffe, Ohio 44092, Former Ramada® Site No. 26455-77316-01**

Dear Sir or Madam:

We represent Ramada Worldwide Inc. ("RWI") relative to issues relating to the guest lodging facility located at 28600 Ridgehills Drive, Wickliffe, Ohio 44092 (the "Facility") operating as a Ramada®. We write to demand that you cease and desist from using the Ramada® trade name, trademarks or service marks (collectively, the "Ramada® Marks"), and/or names and marks that are confusingly similar to the Ramada® Marks.

The Franchise Agreement between Inn at The Wickliffe, LLC ("Wickliffe") and RWI was terminated effective July 10, 2013. Thus, the Facility is no longer authorized to operate as a Ramada®. Pursuant to the Franchise Agreement, the Facility was required to immediately cease using all of the Ramada® Marks. Since the termination of the Franchise Agreement, the Facility has used the Ramada® Marks without authorization to rent rooms through, among other things, failure to remove the RWI

E-mail: Bryan.Couch@leclairryan.com
Direct Phone: (973) 491-3582
Direct Fax: (973) 491-3632

1037 Raymond Boulevard, Sixteenth Floor
Newark, New Jersey 07102
Phone: 973.491.3600 \ Fax: 973.491.3555

CALIFORNIA \ COLORADO \ CONNECTICUT \ MARYLAND \ MASSACHUSETTS \ MICHIGAN \ NEW JERSEY \ NEW YORK \ PENNSYLVANIA \ VIRGINIA \ WASHINGTON, D.C.

ATTORNEYS AT LAW \ WWW.LECLAIRRYAN.COM

signage and continuing to utilize the Ramada® Marks throughout the Facility. Specifically, by way of example and not limitation, signage bearing the Ramada® Marks is located at the Facility, on nearby highways, and in the Facility's public areas, all within view of the traveling public.

As you know, RWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services. RWI owns and has the exclusive right to license the use of the Ramada® Marks, as well as the distinctive Ramada® System, which provides hotel services to the public under the Ramada name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services. RWI or its predecessors have continuously used each of the Ramada® Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

RWI prides itself on the quality of its services, and its reputation for quality, and the very substantial good will that has become attributable to it. RWI has spent substantial sums in development, and promotion of the good will associated with the Ramada® Marks and views them as substantial proprietary assets. The value of RWI's good will exceeds hundreds of millions of dollars.

The Facility's continued use of the Ramada® Marks constitutes an infringement of Ramada's rights. This infringement is: 1) causing confusion among the public as to the affiliation of the Facility with the Ramada System; and 2) damaging contractual relations between RWI and its legitimate franchisees. This has caused dilution and disparagement of the distinctive quality of the Ramada® Marks, and lessened the capacity of the Ramada® Marks to identify and distinguish the goods and services of WII, all in violation of Section 43(c) of the Lanham Act.

Please be advised that if the Facility does not cease and desist from (1) using all Ramada® Marks; (2) displaying signage confusingly similar to the Ramada® Marks; and (3) otherwise identifying the Facility as a Ramada® by the close of business on Monday, June 1, 2015, RWI will immediately move for injunctive relief and seek to recover damages which, under the Lanham Act, may include an award of treble damages and attorneys' fees. See 15 U.S.C. § 1114, et seq.

Finally, Wickliffe has also failed to satisfy its financial obligations to RWI. Liquidated damages in the amount of $213,000.00, and outstanding Recurring Fees, which now total $30,652.61, remain due and owing under the Franchise Agreement. Wickliffe is responsible for the payment of the past due amounts. Meeta Sheth and

Ghanshyam Patel are also responsible for payment of these amounts as personal guarantors of Wickliffe's obligations under the Franchise Agreement.

We are hopeful that we can reach an amicable resolution to the current problem. However, while RWI generally is desirous of avoiding litigation, it will vigorously enforce its proprietary rights where it believes that infringement is occurring and that litigation cannot otherwise be avoided. **This letter will be our sole attempt to resolve this matter prior to the institution of legal proceedings seeking all available relief on behalf of our client.**

The foregoing is not intended, nor shall it be construed, as a complete recitation of the facts and events concerning the above-referenced matter or the law or claims of RWI in the event filings with respect thereto, nor shall it be construed as a complete recitation of any of your rights, claims, damages or remedies, legal or equitable. Nothing hereinabove stated or omitted shall be deemed a waiver or limitation of any right, remedy, claim, or cause of action of any kind whatsoever, all of which are hereby expressly reserved. This letter is written without prejudice to any claims which RWI may have against you and/or related entities, including but not limited to injunctive relief and money damages, should action against you prove necessary.

Please do not hesitate to contact me if you have any questions about this matter.

Very truly yours,

Bryan P. Couch